# Exhibit B

STATE OF SOUTH DAKOTA )                     IN CIRCUIT COURT
                                              :SS
COUNTY OF YANKTON )                          FIRST JUDICIAL CIRCUIT

---

Compeer Financial, PCA,

                    Plaintiff,              Case No. _____

vs.

Sunwold Farms, Inc., Sunterra
Farms Iowa, Inc., and Lariagra
Farms South, Inc.,

                    Defendants.

---

## COMPLAINT

---

**COMES NOW**, the above-named Plaintiff Compeer Financial, PCA ("**Compeer**"), by and through its undersigned attorneys, and for its Complaint against the above-named Defendants, states and alleges as follows:

This action for fraud and breach of loan agreements seeks the immediate appointment of a receiver to prevent the starvation and death of more than 110,000 pigs located in South Dakota and to seek redress for the perpetration of a check kiting scheme involving billions of dollars fraudulently transferred by the Defendants and their principals between Canada and the United States.  Defendants are borrowers of Compeer who pledged their pig inventory in South Dakota as the primary collateral for a loan commitment of $11.5 million.  However, due to Defendant's fraudulent check kiting, Compeer is currently facing losses in excess of $36 million.  Compeer is the only source of available funds for the care and feeding of the pigs, and a receiver is urgently needed to facilitate the continued care of these animals and remove the principals who have engaged in sophisticated fraudulent activity to Compeer's severe detriment.

## THE PARTIES

1.      Compeer is an instrumentality under the laws of the United States and has an office germane to this proceeding located at 1921 Premier Drive, Mankato, Minnesota 56002.

2.      Defendant Sunwold Farms, Inc. ("**Sunwold**") is, upon information and belief, a South Dakota corporation with a registered office address of 907 West Cedar Street, Beresford, South Dakota 57004.

3.      Defendant Sunterra Farms Iowa, Inc. ("**Sunterra**") is, upon information and belief, an Iowa corporation with a registered office address of 907 West Cedar Street, Beresford, South Dakota 57004.  Although it is incorporated in the state of Iowa, Sunterra nevertheless regularly transacts business in the state of South Dakota.

4.      Defendant Lariagra Farms South, Inc. ("**Lariagra**") is, upon information and belief, a South Dakota corporation with a registered office address of 907 West Cedar Street, Beresford, South Dakota 57004.  Sunwold, Sunterra, and Lariagra are collectively referred to herein as "**Defendants**."

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to SDCL § 16-6-9 and other applicable law, if any.

6.      Venue is proper in Yankton County pursuant to SDCL § 15-5-1, SDCL § 15-5-2, SDCL § 15-5-8, and other applicable law, if any, because (i) this cause of action, or some part thereof, arose in Yankton County, (ii) all three of the Defendants regularly transact business in Yankton County, and (iii) a substantial amount of the personal property owned by Sunwold and Lariagra and which are the subject of this receivership action are located in Yankton County.

## GENERAL BACKGROUND INFORMATION

7.      This case involves a multi-state and international swine operation involving multiple generations of the Price Family located, upon information and belief, in and around the Village of Acme located in Alberta, Canada. The Defendants operate extensive swine operations in South Dakota and Iowa and their assets, employees, books and records are located in these jurisdictions. They have granted exclusive security over all their assets to Compeer in these jurisdictions. Due to the long running fraud on Compeer by the Defendants' management, as set out in detail below, Defendants' management cannot be trusted to operate the business, protect the perishable assets and maximize the available business assets for the benefit of the secured creditor, Compeer, or any other creditors.

8.      Ray Price, Art Price, and Glen Price are siblings who, upon information and belief, are directors, members, and/or shareholders of Defendants or Defendants' parent companies and make decisions for and run the Defendants' businesses and various other businesses related to and associated with Defendants, including but not limited to the Sunterra Group.

9.      The Sunterra Group is, upon information and belief, a Canadian umbrella entity that various members of the Price Family own and utilize to facilitate a "farm to fork" integrated agricultural operation by (i) raising cattle, swine, and other farming commodities, (ii) processing the same for human consumption, and then (iii) selling that fresh food directly to consumers through a grocery store chain owned by the Price Family and/or subsidiary companies that are owned by the Price Family and located in Canada.

10.     This action pertains directly to the three above-named Defendants, all of which are borrowers of Compeer and all three of which currently own, manage, and/or raise approximately 110,000 swine[1] in fifty-four barns located in and around Yankton County, South Dakota.

11.     Sunterra is an Iowa corporation that is owned by a Canadian parent company named Sunterra Enterprises Inc.  Sunterra Enterprises Inc. is owned and controlled by the Price Family either directly or through one of the Price Family's wholly owned subsidiaries.

12.     Sunterra is a hog management company that manages approximately 500,000[2] pig spaces for Sunwold, Lariagra, and various other entities.  Upon information and belief, Sunterra's earnings have been historically generated from management fees paid by the companies for which Sunterra manages hogs.

13.     Sunwold is a South Dakota corporation that is owned by a Canadian parent company named Sunterra Enterprises, Inc.  Sunterra Enterprises, Inc. is an entity owned and controlled by various members of the Price Family.

14.     Sunwold is a "wean-to-finish" operation.  This means that Sunwold purchases weaned pigs (from Canadian entities owned by the above-referenced Sunterra Group), and then Sunwold raises those pigs to market weight in contract nursery and finishing barns located in South Dakota.  Upon information and belief, Sunwold currently owns and is in the process of finishing out approximately 62,173 pigs.

---

[1] These hogs are currently at all stages of growth and development ranging from approximately 12-pound newly weaned pigs to finished hogs that are in excess of 280 pounds, and which are ready to be sold and slaughtered.

[2] While Sunterra manages approximately 500,000 hogs for multiple different entities, approximately 110,000 of these hogs managed by Sunterra are owned by Sunwold and Lariagra. The remaining approximately 370,000 hogs managed by Sunterra are not owned by Sunterra, Sunwold or Lariagra.

4

15.    Lariagra is a South Dakota corporation that is owned by Sunterra Enterprises Inc.

16.    Like Sunwold, Lariagra is a "wean-to-finish" operation.  Lariagra purchases weaned pigs (from a Canadian sow farm owned and/or controlled by various members of the Price Family or entities controlled by them), and then Lariagra raises those pigs to market weight in contract nursery and finishing barns located in South Dakota.  Upon information and belief, Lariagra currently owns and is in the process of finishing out approximately 48,725 pigs.

17.    Compeer is a member of the Farm Credit System, providing lending and other financial services to its member-owners, who are producers, processors, and marketers of agricultural products.

18.    Compeer was formed in or about 2017, as the product of a merger of three other Farm Credit Associations.  Since approximately 2005, Compeer and its predecessors have provided loans and other financing to various entities owned and controlled by the Price family, including Defendants.

## THE DEFENDANTS' CHECK-KITING SCHEME AND DEFAULT

19.    Compeer commenced this action following the collapse of an international check-kiting scheme perpetrated by Defendants.

20.    "'Check-kiting' is the practice of opening one or more accounts in several banks and 'checks are drawn on one account and deposited in the other when neither account has any substantial funds.'" *Norwest Bank Black Hills, N.A. v. Rapid City Teachers Federal Credit Union*, 433 N.W.2d 560, 564 (S.D.1988) (concurrence) (citing *Mid–Cal National Bank v. Federal Reserve Bank*, 590 F.2d 761, 762, (C.A.9 1979)). "Taking advantage of the delay in the check collection process, checks are exchanged daily between these accounts, which continually shows credits of 'uncollected funds.' The kite will collapse when one of the banks refuses to honor a check drawn

upon 'uncollected funds.'" *Id.* "Check kiting is a form of bank fraud." *First Nat. Bank in Harvey v. Colonial Bank*, 898 F. Supp. 1220, 1222 (N.D. Ill. 1995). "The kiter opens accounts at two (or more) banks, writes checks on insufficient funds on one account, then covers the overdraft by depositing a check drawn on insufficient funds from the other account." *Id.* "By timing the scheme correctly and repeating it over a period of time, the kiter can use the funds essentially as an interest-free loan." *Id.* (citing *Williams v. United States*, 458 U.S. 279, 281 n.1 (1982)). "A kite crashes when one of the banks dishonors checks drawn on it and returns them to the other banks involved in the kite." *Id.* at 1223.

21.     As described in greater detail below, the Defendants each established revolving lines of credit with Compeer, documented in promissory notes and loan agreements, that allowed them to borrow up to a combined $11,500,000.00 across all three entities. Those lines of credit were secured by security agreements in which the Defendants granted Compeer a senior, perfected security interest in various items of personal property, including but not limited to all of the 110,000 pigs located in South Dakota.

22.     The revolving lines of credit were coupled with financial products called "Farm Cash Management" ("FCM") accounts. The FCM accounts allowed the Defendants to deposit excess cash in its accounts with Compeer in order to earn interest on those funds, similar to a money market account. When the Defendants were in a net borrowing, or "draw," position on their accounts, they would owe Compeer the debt pursuant to the credit agreements and as secured by the collateral; but when the Defendants had repaid their lines of credit and deposited additional funds to be in a net positive, or "balance," position they would earn interest on the positive balance in the FCM account and Compeer would owe those funds to the Defendants. The revolving lines and FCM accounts worked together seamlessly, allowing the Defendants to write checks in

6

amounts equal to the combined total of their credit limit ($11,500,000.00) and their positive balance (if any) at any given time. In this way, for example, if the Defendants were in a net "draw" position of $5,000,000.00, they could write checks up to $6,500,000.00 against those accounts; by contrast, if they had a net "balance" of $5,000,000.00, the Defendants could write checks up to $16,500,000.00 against those accounts.

23.      On or about February 10, 2025, Compeer's accounts showed that the Defendants had a combined positive balance of approximately $21 million in funds payable to the Defendants. That overall positive balance was comprised of a positive FCM balance of approximately $14 million for Sunterra; a positive FCM balance of approximately $10 million for Sunwold; and a draw on the Lariagra operating line of approximately $3 million.

24.      On February 10, 2025, Compeer's in-house counsel were made aware of significant recent activity involving the Defendants' accounts. Specifically, Compeer's internal counsel were made aware that the Defendants were: (i) using the check-writing features on their lines of credit and FCM accounts to write multiple checks each day, which were being sent via next-day mail to be deposited into an account with National Bank of Canada, previously Canadian Western Bank ("**CWB**"), and (ii) simultaneously sending Compeer multiple checks each day drawn against that CWB account to pay down its lines of credit and/or increase the balance in its FCM accounts with Compeer. In other words, the Defendants seemed to be sending nearly identical amounts and numbers of checks back and forth between CWB and Compeer each and every day. Each check was issued in denominations generally ranging between $800,000 and $990,000, and no single check exceeded $1 million. Upon information and belief, a check deposited across international lines for more than $1 million would have triggered additional scrutiny by the United States Bulk Exchange.

25.    While Compeer's investigation into the Defendants' accounts and their related activity is ongoing, early findings suggest the Defendants engaged in substantial and sustained activity consistent with a sophisticated check-kiting scheme.  For example, in the period between January 1, 2025 and February 10, 2025 alone, the Defendants issued 474 checks out of their Compeer accounts (for deposit with CWB) for a total of $431,301,200, while during the same time they deposited 472 checks into their Compeer accounts (out of CWB) for a total of $432,359,712.35.  These simultaneous transfers occurred nearly daily throughout this period, and average out to approximately 18 checks for a total of $16,588,508 out of the Compeer accounts *each day*.

26.    This scheme artificially decreased any indebtedness that the Defendants had to Compeer, and falsely increased any positive FCM balance that Compeer would have owed back to those entities.  This is because Compeer would generally credit the entities' accounts on the day that the check was deposited, even though it could take several days for the check to clear (i.e., for Compeer to actually receive the funds from CWB).  In check kiting, this period is called the "float." Upon information and belief, there were similar delays between crediting and processing of checks at CWB. Accordingly, Defendants and their principals used the "float" to falsely create the illusion of positive cash balances at both financial institutions.

27.    In response to these revelations, on February 11, 2025, Compeer personnel spoke with Defendants' CEO, Ray Price, by video conference in an effort to better understand the situation and Defendants' significant check-writing activity.  During that conversation, Ray Price stated that he was not sure of the reason for the significant activity other than to say that it was a "timing" issue, and he would have to consult with internal personnel to advise further.  Following that meeting, Compeer informed Mr. Price in writing that Compeer was exercising its right to

8

terminate check-writing privileges out of the Compeer accounts for any intercompany transfers, but also stated that it would consider permitting checks written for necessary operational expenses, such as feed for animals.

28.     In accordance with that written notice, on February 11, 2025, Compeer immediately took action to ensure that checks by the Defendants would have to be manually approved, so that Compeer could monitor their check-writing activity.  That same day, Compeer was notified that 18 checks had been drawn on the Compeer accounts for intercompany transfers to CWB, totaling $16,302,000.  Pursuant to its written notice to Mr. Price, Compeer dishonored all 18 of those checks.

29.     On the morning of February 12, 2025, Compeer received another batch of approximately $9 million in checks drawn on the CWB account for deposit into the Defendants' Compeer accounts.

30.     On February 12, 2025, Compeer personnel had another video conference with Mr. Ray Price.  During the call, Mr. Price admitted that:

a.   The Defendants were moving funds back and forth between Compeer and CWB to make sure the Defendants had sufficient money flow so they would not be overdrawn on their Compeer accounts.

b.   They shouldn't have done what they did.

c.   The practice of sending checks back and forth between the same accounts was "wrong."

d.   If Compeer deposited the $9 million in checks received earlier that day but did not permit new checks to be drawn on the Compeer accounts, that would cause an overdraft at CWB.

9

e.  If Compeer did not allow the Defendants to move money from Compeer to CWB, then Defendants would not have enough money to cover their operational expenses.

f.  Mr. Price felt "badly" that Compeer has been paying interest to the Defendants for the positive FCM balances.

g.  Mr. Price believed that Compeer was holding more than $20 million in positive FCM balances that he wanted sent back to the accounts at CWB, at least in part, to cover their overdraft position at CWB.

31.  Following the February 12, 2025 call with Ray Price, Compeer confirmed to him that it would not deposit the $9 million in checks that had been presented to Compeer for deposit from CWB.

32.  On February 13, 2025, Compeer personnel had another call with Ray Price.  At that time, Mr. Price advised that the CWB accounts were overdrawn by approximately $21 million, and they needed money sent back from Compeer to cover the overdrafts.  Compeer advised Price that it could not release any funds unless and until it could verify that there were good and valid funds in the account.  Compeer requested consent to communicate directly with CWB to verify funds, but Price would not provide consent.

33.  Due to Farm Credit Administration regulations, Compeer was restricted from sharing information about the Defendants' accounts with CWB, and Defendants advised that CWB had similar restrictions on sharing information with Compeer.  Compeer repeatedly requested consent from Price and other principals of Defendants to communicate directly with CWB, but those requests were refused.

34.  During the week of February 24, Compeer determined that CWB had dishonored 65 checks totaling $59,900,000 which had previously been credited by Compeer to the Defendants'

accounts.  As a result, the approximately $21 million positive cash balance that was showing in Defendants' accounts as owed by Compeer was immediately wiped out, and instead there was more than $30 million of debt owing from Defendants to Compeer, despite Compeer only providing Defendants with a combined credit limit of $11.5 million.

35.    After accounting for additional deposits and withdrawals to the account, the total indebtedness of the Defendants to Compeer at the time of this Complaint is over $36 million.

36.    On March 17, 2025, CWB filed an application in the Court of King's Bench of Alberta, Canada ("Application") requesting the appointment of FTI Consulting Canada, Inc. ("FTI") as an interim receiver over present and after-acquired bank accounts, monies, funds, receivables, cheques, choses in action, and books and records pursuant to the Canadian *Bankruptcy and Insolvency Act*.  The Application appears to include Defendants' accounts held with Compeer but does not include the over 110,000 head of swine owned by Sunwold and Lariagra and in the care of Sunterra or the additional approximately 370,000 head of swine owned by third parties but in the care of Sunterra.  A true and correct copy of the Application is attached hereto and made a part hereof as **Exhibit A.**

37.    Although Compeer has no contractual obligation to continue advancing funds to Defendants, Compeer has continued to provide funds that are necessary to the care and feeding of the pigs located in South Dakota.  Compeer has repeatedly requested additional information from Ray Price, Art Price, and Dave Price about Defendants' finances in Canada and their financial position with CWB, but the Prices have refused to permit Compeer to communicate substantively with CWB and have refused to provide transparency about their financial condition or Compeer's exposure to additional losses.

11

38.     Compeer is unable and unwilling to continue providing funds to the Defendants while the parties who perpetrated this fraudulent scheme against Compeer and CWB remain in control of those entities.  Upon information and belief, the Defendants have no other source of funds to continue providing for the care and feeding of the approximately 110,000 pigs in South Dakota.

39.     While Sunterra's and Sunwold's check kiting scheme was collapsing, Compeer commenced an inspection of its collateral, which included approximately 110,000 head of swine collateral to ensure the welfare and continued care of these animals and to verify Defendants' inventory (*infra*, ¶¶ 45, 56); while doing this, Compeer also pursued an international investigation to evaluate the scope of the Defendants' defaults since the activity involved lending institutions in both the United States of America and Canada.

## THE DEFENDANTS' THREE INDIVIDUAL LINES OF CREDIT AND SECURITY AGREEMENTS WITH COMPEER

40.     As set forth below, each of the three Defendants are currently financed by Compeer pursuant to a Defendant-specific line of credit.

### Sunwold Line of Credit

41.     On October 7, 2024, Sunwold executed and delivered to Compeer a promissory note/loan agreement, which established a revolving line of credit expressly limited to Seven Million Dollars ($7,000,000.00) (hereinafter the "Sunwold Line of Credit").  A true and correct copy of the Sunwold Line of Credit is attached hereto and made a part hereof as **Exhibit B.**

42.     To secure the repayment of the indebtedness evidenced by the Sunwold Line of Credit, Sunwold executed and delivered to Compeer a Security Agreement, dated October 7, 2024 ("2024 Sunwold Security Agreement") wherein Sunwold granted Compeer a security interest in various items of personal property defined therein, including but not limited to all crops, livestock

12

and poultry, feed, seed, etc., accounts and general intangibles, equipment, contract rights, chattel paper, documents, accounts, and general intangibles, accounts receivable arising from the sale of all collateral, association stock, and proceeds from the disposition of the foregoing items, etc. ("Sunwold's Personal Property[3]").  A true and correct copy of the 2024 Sunwold Security Agreement is attached hereto and made a part hereof as **Exhibit C.**

43.     To secure the repayment of the indebtedness evidenced by the Sunwold Line of Credit, Sunterra and Lariagra executed and delivered to Compeer a separate Security Agreement, dated August 28, 2023 (the "2023 Sunwold Security Agreement") wherein Sunterra and Lariagra each granted Compeer a security interest in various items of personal property defined therein, including but not limited to all crops, livestock and poultry, feed, seed, etc., accounts and general intangibles, equipment, contract rights, chattel paper, documents, accounts, and general intangibles, accounts receivable arising from the sale of all collateral, association stock, and proceeds from the disposition of the foregoing items, etc. ("Sunterra's and Lariagra's Personal Property").  A true and correct copy of the 2023 Sunwold Security Agreement is attached hereto and made a part hereof as **Exhibit D.**

44.     Compeer perfected its security interests in Sunwold's Personal Property and Sunterra's and Lariagra's Personal Property by filing a UCC-1 Financing Statement with the South Dakota Secretary of State ("Sunwold Financing Statements"). A true and correct copy of the Sunwold Financing Statements are attached hereto and made a part hereof as **Exhibit E.**

45.     On February 24 and February 25, 2025, Compeer personally inspected all of Sunwold's known swine, which constitutes the majority of Sunwold's Personal Property.  As of

---

[3] Upon information and belief, Sunwold's Personal Property are the only assets owned by Sunwold.

February 24 and 25, 2025, Sunwold's swine inventory equaled approximately 62,173 hogs, which Compeer reasonably values at $8,752,013.00. Upon information and belief, the only other assets with value that constitute Sunwold's Personal Property[4] are meat packer receivables from the sale of Sunwold's swine, which as of March 17, 2025, equals $203,334.00. As such, the total value of Sunwold's Personal Property is $8,955,347.00.

**Sunterra Line of Credit**

46.    On October 7, 2024, Sunterra executed and delivered to Compeer a promissory note/loan agreement, which established a revolving line of credit expressly limited to Five Hundred Thousand Dollars ($500,000.00) (hereinafter the "Sunterra Line of Credit"). A true and correct copy of the Sunterra Line of Credit is attached hereto and made a part hereof as **Exhibit F.**

47.    To secure the repayment of the indebtedness evidenced by the Sunterra Line of Credit, Sunterra executed and delivered to Compeer a Security Agreement, dated September 26, 2023 (the "2023 Sunterra Security Agreement") wherein Sunterra granted Compeer a security interest in various items of personal property defined therein, including but not limited to all crops, livestock and poultry, feed, seed, etc., accounts and general intangibles, equipment, contract rights, chattel paper, documents, accounts, and general intangibles, accounts receivable arising from the sale of all collateral, association stock, and proceeds from the disposition of the foregoing items, etc. ("Sunterra's Personal Property[5]"). A true and correct copy of the 2023 Sunterra Security Agreement is attached hereto and made a part hereof as **Exhibit G.**

---

[4] The Defendants have hedging accounts that would be collateral for Compeer. However, collectively the accounts do not have any value as of February 28, 2025.

[5] Upon information and belief, Sunterra's Personal Property are the only assets owned by Sunterra.

48.     To secure the repayment of the indebtedness evidenced by the Sunterra Line of Credit, Sunwold and Lariagra executed and delivered to Compeer a Security Agreement, dated October 7, 2024, (the "2024 Sunterra Security Agreement") wherein Sunwold and Lariagra each granted Compeer a security interest in various items of personal property defined therein, including but not limited to all crops, livestock and poultry, feed, seed, etc., accounts and general intangibles, equipment, contract rights, chattel paper, documents, accounts, and general intangibles, accounts receivable arising from the sale of all collateral, association stock, and proceeds from the disposition of the foregoing items, etc. ("Sunwold's and Lariagra's Personal Property").  A true and correct copy of the 2024 Sunterra Security Agreement is attached hereto and made a part hereof as **Exhibit H.**

49.     Compeer perfected its security interests in Sunterra's Personal Property and Sunwold's and Lariagra's Personal Property by filing a UCC-1 Financing Statement with the South Dakota Secretary of State ("Sunterra Financing Statements").  A true and correct copy of the Sunterra Financing Statements is attached hereto and made a part here of as **Exhibit I.**

50.     Upon information and belief, the only assets owned by Sunterra are accounts receivable (i.e., mostly management fees as outlined in paragraph 12 above).  To date, Compeer is unable to verify Sunterra's current accounts receivable.  Upon information and belief, as of August 24, 2024, the last date Sunterra provided documentation, Sunterra had only $3,007,769.00 of accounts receivable.  With regard to debt, as set forth in paragraph 45 below, the Sunterra Line of Credit for which Compeer is overdrawn by more than Eighteen Million Dollars ($18,000,000.00).

**Lariagra Line of Credit**

51.     On October 7, 2024, Lariagra executed and delivered to Compeer a promissory note/loan agreement, which established a revolving line of credit expressly limited to Four Million

15

Dollars ($4,000,000.00) (hereinafter the "Lariagra Line of Credit" and hereinafter collectively with the Sunwold Line of Credit and the Sunterra Line of Credit referred to as the "**Lines of Credit**"). A true and correct copy of the Lariagra Line of Credit is attached hereto and made a part hereof as **Exhibit J.**

52.    To secure the repayment of the indebtedness evidenced by the Lariagra Line of Credit, Lariagra executed and delivered to Compeer a Security Agreement, dated October 7, 2024, ("Lariagra's Security Agreement") wherein Lariagra granted Compeer a security interest in various items of personal property defined therein, including but not limited to all crops, livestock and poultry, feed, seed, etc., accounts and general intangibles, equipment, contract rights, chattel paper, documents, accounts, and general intangibles, accounts receivable arising from the sale of all collateral, association stock, and proceeds from the disposition of the foregoing items, etc. ("Lariagra's Personal Property[6]"). A true and correct copy of Lariagra's Security Agreement is attached hereto and made a part hereof as **Exhibit K.**

53.    To secure the repayment of the indebtedness evidenced by the Lariagra Line of Credit, Sunwold and Sunterra executed and delivered to Compeer a Security Agreement, dated October 7, 2024, ("Sunwold's and Sunterra's Security Agreement") wherein Sunwold and Lariagra each granted Compeer a security interest in various items of personal property defined therein, including but not limited to all crops, livestock and poultry, feed, seed, etc., accounts and general intangibles, equipment, contract rights, chattel paper, documents, accounts, and general intangibles, accounts receivable arising from the sale of all collateral, association stock, and proceeds from the disposition of the foregoing items, etc. ("Sunwold's and Sunterra's Personal

---

[6] Upon information and belief, Lariagra's Personal Property are the only assets owned by Lariagra.

Property"). A true and correct copy of the Sunwold's and Sunterra's Security Agreement is attached hereto and made a part hereof as **Exhibit L.**

54.     Compeer perfected its security interests in Lariagra's Personal Property and Sunwold's and Sunterra's Personal Property by filing a UCC-1 Financing Statement with the South Dakota Secretary of State ("Lariagra Financing Statements"). A true and correct copy of the Lariagra Financing Statements is attached hereto and made a part hereof as **Exhibit M**.

55.     Each of the notes evidencing the Lines of Credit and each of the above-referenced security agreements expressly provide that Compeer is entitled to recover its reasonable attorneys' fees, costs, and expenses incurred in enforcing its rights and remedies under said loan documents.

56.     On February 25 and February 26, 2025, Compeer personally inspected all of Lariagra's known swine, which constitutes the majority of Lariagra's Personal Property. As of February 25 and 26, 2025, Lariagra's swine inventory consisted of 48,725 hogs, which Compeer reasonably values at $6,858,956.00. Upon information and belief, the only other assets with value that constitute Lariagra's Personal Property are meat packer receivables from the sale of Lariagra's swine, which as of March 17, 2025, equals $195,652.00. As such, the total value of Lariagra's Personal Property is $7,054,608.00.

57.     All of the Lines of Credit are cross collateralized by all the Defendants' personal property that is referenced and defined in paragraphs 42, 43, 47, 48, 52, and 53 above; said personal property that cross collateralizes the Lines of Credit shall be collectively referred to herein as the "Collateral."

58.     The current value of the Collateral is approximately $19,017,724.00. *See supra*, ¶¶ 45, 50, and 56.

59.     Moreover, the Defendants each expressly consented to the appointment of a receiver in the event of default pursuant to the terms of Section 13 of the Lines of Credit Additional Provisions, to take possession of all collateral of the Defendants, including but not limited to all personal property, and all facilities, fixtures and equipment leased, occupied or used by the Defendants. Defendants also irrevocably consented to the appointment of such receiver and agreed to cooperate and assist any such receiver as reasonably requested to facilitate the transfer of possession of the collateral to such receiver and to provide receiver access to all books, records, information and documents as requested by such receiver.

60.     On March 10, 2025, Compeer sent each of the three Defendants a Notice of Default and Demand for Accelerated Payment (Notice of Default and Acceleration Demand) on each of the three Lines of Credit.

61.     Sunwold defaulted under the terms of the Sunwold Line of Credit, which default includes, but is not necessarily limited to, (i) failing to make the payments when due under the Sunwold Line of Credit, (ii) engaging in a fraudulent, multi-million dollar check-kiting scheme, and (iii) otherwise breaching its contractual obligations to Compeer as more fully set forth in Compeer's Notice of Default and Acceleration Demand directed to Sunwold.   A true and correct copy of Compeer's Notice of Default and Acceleration Demand relative to the Sunwold Line of Credit is attached hereto and made a part hereof as **Exhibit N**.

62.     Sunterra defaulted under the terms of the Sunterra Line of Credit, which default includes, but is not necessarily limited to, (i) failing to make the payments when due under the Sunterra Line of Credit, (ii) engaging in a fraudulent, multi-million dollar check-kiting scheme, and (iii) otherwise breaching its contractual obligations to Compeer as more fully set forth in Compeer's Notice of Default and Acceleration Demand directed to Sunterra.  A true and correct

18

copy of Compeer's Notice of Default and Acceleration Demand relative to the Sunterra Line of Credit Note is attached hereto and made a part hereof as **Exhibit O.**

63.     Lariagra defaulted under the terms of the Lariagra Line of Credit, which default includes, but is not necessarily limited to (i) failing to make the payments when due under the Sunterra Line of Credit, and (ii) otherwise breaching its contractual obligations to Compeer as more fully set forth in Compeer's Notice of Default and Acceleration Demand directed to Lariagra. A true and correct copy of Compeer's Notice of Default and Acceleration Demand relative to the Lariagra Line of Credit Note is attached hereto and made a part hereof as **Exhibit P.**

64.     Although the Sunwold Line of Credit is limited to Seven Million Dollars ($7,000,000.00), following confirmation of the dishonoring millions of dollars of checks – which Compeer has now received – as of March 7, 2025, this line of credit currently has Fourteen Million, One Thousand, Three Hundred Eighty-Five Dollars and Eighty-Six Cents ($14,001,385.86) drawn on it.  As such, as of March 7, 2025, the Sunwold Line of Credit is overdrawn by more than Seven Million Dollars due to the above-cited check-kiting scheme.

65.     Although the Sunterra Line of Credit is limited to Five Hundred Thousand Dollars ($500,000.00), following confirmation of the dishonoring millions of dollars of checks – which Compeer has now received – as of March 7, 2025, this line of credit currently has Eighteen Million, Nine Hundred Forty-Three Thousand, Four Hundred Sixty-Eight Dollars and Thirty-Five Cents ($18,943,468.35) drawn on it.  As such, as of March 7, 2025, the Sunterra Line of Credit is overdrawn by more than Eighteen Million Dollars due to the above-cited check-kiting scheme.

66.     Consequently, as of March 7, 2025, the Sunwold Line of Credit and the Sunterra Line of Credit collectively have Thirty-Two Million, Nine Hundred Forty-Four Thousand, Eight

Hundred, Fifty-Four Dollars and Twenty-One Cents ($32,944,954.21) drawn on them, which collectively constitutes an overdraft in excess of $25 million on these two lines of credit.

67.    As of March 7, 2025, the Lariagra Line of Credit has Two Million, Three Hundred Fourteen Thousand, Eight Hundred Forty-Two Dollars and Forty-One Cents ($2,314,842.41) drawn on it. But even though the Lariagra Line of Credit is not presently overdrawn, the approximately $7,054,608.00 value of Lariagra's Personal Property (which secures all three Lines of Credit) is not remotely close to adequately collateralize the greater than $25 million overdraft on the Sunwold Line of Credit and the Sunterra Line of Credit.

68.    In sum, the Defendants are insolvent because (i) the Defendants' Lines of Credit that have Thirty-Five Million, Two Hundred Fifty-Nine Thousand, Seven Hundred Ninety-Six Dollars and Sixty-Two Cents ($35,259,796.62) drawn on them, and (ii) the Collateral (i.e., Defendants' assets) are currently valued at approximately $19,017,724.00.

69.    Given the above-referenced overdrafts on the Sunwold Line of Credit and the Sunterra Line of Credit and the fact that Defendants have no additional source(s) of financing and/or any other assets that could be liquidated to pay for the continued feeding and care of the approximately 110,000 swine that are owned by Sunwold and Lariagra, these swine are in imminent danger of starvation if feed is not promptly purchased and delivered to barns housing the pigs.

70.    In like manner, these swine are in imminent danger of not being cared for if all of the Defendants' workers who care for these animals walk off their jobs because the Defendants are unable to pay these workers for their employment and/or independent contractor work.

71.    Given the forgoing facts and circumstances, Compeer respectfully submits that a receiver should be promptly appointed, including without limitation on an ex parte basis, so that

Compeer can advance the funds that are necessary and appropriate to protect its Collateral (i.e., to prevent the mass starvation of approximately 110,000 swine and to ensure that all necessary workers are compensated for their work in taking care of these swine during the pendency of this case).

## COUNT I
## ABATEMENT OF MEDIATION

72.     Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

73.     Pursuant to S.D.C.L. § 54-13-10, the time delay to conduct mediation with the director of the agricultural mediation program would cause Compeer to suffer irreparable harm because there are reasonable grounds to believe that the borrower may waste, dissipate, or divert agricultural property or that agricultural property is in imminent danger of deterioration, specifically, the approximately 110,000 head of swine.

74.     Sunwold and Sunterra have fraudulently removed, dissipated or divert assets relating to agricultural property through their check-kiting scheme.

75.     Over 110,000 head of swine are in imminent danger of deterioration if Defendants abandon them based upon Compeer calling a default under the Lines of Credit.

76.     Based upon the foregoing, Compeer is entitled to an Order permitting Compeer to proceed with actions herein and other actions available to it at law by directing that mediation as required by S.D.C.L. Chapter 54-13 be deemed unnecessary and inapplicable because it would cause Compeer and the 110,000 head of swine to suffer irreparable harm.

## COUNT II
## BREACH OF NOTE EVIDENCING THE SUNWOLD LINE OF CREDIT

77.     Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

21

78.    As a consequence of the defaults under the terms of the Sunwold Line of Credit, Compeer is now entitled to a judgment against Sunwold in the amount of **$14,001,385.86**, plus all unpaid interest and late charges accrued after March 7, 2025, and also including all reasonable attorneys' fees and legal expenses recoverable under the terms and conditions of the Sunwold Line of Credit.

**COUNT III**
**BREACH OF NOTE EVIDENCING THE SUNTERRA LINE OF CREDIT**

79.    Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

80.    As a consequence of the defaults under the terms of the Sunterra Line of Credit, Compeer is now entitled to a judgment against Sunterra in the amount of **$18,943,468.35**, plus all unpaid interest and late charges accrued after March 7, 2025, and also including all reasonable attorneys' fees and legal expenses recoverable under the terms and conditions of the Sunterra Line of Credit.

**COUNT IV**
**BREACH OF NOTE EVIDENCING THE LARIAGRA LINE OF CREDIT**

81.    Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

82.    As a consequence of the defaults under the terms of the Lariagra Line of Credit, Compeer is now entitled to a judgment against Lariagra in the amount of **$2,314,842.41**, plus all unpaid interest and late charges accrued after March 7, 2025, and also including all reasonable attorneys' fees and legal expenses recoverable under the terms and conditions of the Lariagra Line of Credit.

**COUNT V**
**REPLEVIN/CLAIM AND DELIVERY OF PERSONAL PROPERTY**

**[ALTERNATIVE RELIEF TO RECEIVERSHIP]**

83.     Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

84.     Given the defaults under the Lines of Credit, Compeer is entitled to foreclose its security interests, dispose of the Collateral in which Compeer has a security interest as set forth herein and apply the proceeds thereof towards payment of collection costs, liquidation expenses and other charges, all as authorized by the Uniform Commercial Code, with the net balance being applied against the indebtedness due and owing to Compeer.  Compeer's security interests extend to all of the categories of collateral described in the Security Agreements attached to this Complaint, and Compeer is entitled to take immediate possession of and liquidate all of the same.

**COUNT VI**
**FRAUD**

85.     Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

86.     Sunwold's and Sunterra's check kiting activities of drawing on their accounts via checks and depositing them in another account when neither account had funds to cover the amounts of the checks constitutes fraud.

87.     Sunwold and Sunterra each knew when they wrote the various checks that the accounts did not have the funds necessary to cover the amount of the checks.

88.     Sunwold's and Sunterra's respective misrepresentations and non-disclosures relating to the check-kiting scheme intended to deceive and induce Compeer to extend and continue to finance each of the Defendants.

89.     If Compeer had known the truth regarding Sunwold's and Sunterra's check-kiting scheme, Compeer would not have extended, maintained, and/or advanced credit to any of the Defendants, or Compeer would have extended, maintained, and/or advanced credit to Defendants on different terms.

90.     As a result of Sunwold's and Sunterra's misrepresentations and non-disclosure regarding its assets, Compeer will be unable to recover the full amount of money it is owed by repossessing and selling collateral, causing Compeer pecuniary damage.

91.     As a result of Sunwold's and Sunterra's fraud, Compeer is entitled to Judgment against Sunwold and Sunterra and in favor of Compeer in an amount to be determined at trial.

## COUNT VII
## UNJUST ENRICHMENT

92.     Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

93.     As set forth above, Defendants improperly obtained Line of Credit advances, which belong to Compeer.

## COUNT VIII
## APPOINTMENT OF RECEIVER

94.     Compeer restates the allegations set forth above, inclusive, as though fully set forth herein.

95.     Sunwold's and Sunterra's check-kiting scheme evidences all three of the Defendants' gross mismanagement of their interrelated businesses.  In addition, this misconduct has rendered each of the Defendants insolvent.

96.     Based upon information and belief, Sunterra is continuing to operate its swine management operation and Sunwold and Lariagra are continuing to operate their respective swine

production operations.  Sunwold and Sunterra are not, however, servicing the Sunwold Line of Credit and Sunterra Line of Credit, respectively. In fact, Sunwold and Sunterra are significantly overdrawn on their respective lines of credit.

97.     Upon information and belief, Sunwold and Lariagra are not paying barn rent for the barns that are housing some, if not all, of the approximately 110,000 head of swine.

98.     Upon information and belief, the Defendants are not paying feed suppliers for feed that is being fed to some, if not all, of the approximately 110,000 head of swine.

99.     As such, the Defendants are unable to care for the 110,000 head of swine in their possession.  The interests of Compeer, and the 110,000 head of swine, will be prejudiced if the 110,000 head of swine are not properly cared for during the course of these proceedings.

100.    To allow current management to continue to run the Defendants' businesses is greatly prejudicial to Compeer because of the substantial risk of dissipation of assets.

101.    Accordingly, appointment of a receiver is necessary to prevent further dissipation of the Defendants' assets and to protect the Defendants' creditors.

102.    Since the Defendants have failed to make payments necessary for the care of the approximately 110,000 head of swine under their management and/or in their possession, and Defendants are insolvent, Compeer is entitled to the appointment of a receiver in order to preserve and care for the 110,000 head of swine during the course of these proceedings.

103.    Moreover, the Defendants each expressly consented to the appointment of a receiver in the event of default pursuant to the terms of Section 13 of the Lines of Credit Additional Provisions, to take possession of all collateral of the Defendants, including but not limited to all personal property, and all facilities, fixtures and equipment leased, occupied or used by the Defendants.  Defendants also irrevocably consented to the appointment of such receiver and agreed

25

to cooperate and assist any such receiver as reasonably requested to facilitate the transfer of possession of the collateral to such receiver and to provide receiver access to all books, records, information and documents as requested by such receiver.

104.    Given the magnitude of the overdraws perpetrated by at least two of the Defendants, as well as the immediate need to ensure that the Defendants do not leave approximately 110,000 head of swine with no feed, care, or supervision, Compeer respectfully requests that the Court promptly appoint Creative Planning Business Alliance, LLC, a Kansas limited liability company (the "**CPBA**") as a general receiver over all three of the above-named Defendants' respective business operations for a period commencing on the date of this Court's Order formally appointing CPBA as receiver and ending upon termination of such appointment by further Order of this Court.

105.    Compeer is concurrently filing a memorandum and affidavit, along with a proposed Order to Show Cause, and thereafter requesting the Court enter an Order Granting Compeer's Motion for Appointment of CPBA as Receiver on an ex parte basis pursuant to SDCL 21-21-6.

106.    The Order to Show Cause directs Defendants to show cause, if any, why the Court should not appoint CPBA as Receiver, and why the Court should not enter an Order substantially in the form of the order submitted with the motion.

107.    The proposed Order Granting Motion for Appointment of Receiver seeks to grant the receiver the following powers and responsibilities, among others: (1) to take sole and exclusive possession of the Collateral; (2) to take possession of the books and records pertaining to the Defendants' businesses, whether in Defendants' possession or in the possession of any property manager employed by Defendants; (3) to take possession of all meat packer receivables previously paid or to be paid in the future by the meat packers to Defendants as of the date of the granting of

the Motion and all receivables received thereafter; (4) to establish bank accounts in the name of the receiver; and (5) to operate the Defendants' businesses.

108.    Based upon the foregoing allegations, Compeer is entitled to the appointment of a receiver to protect its interest in the Collateral pursuant to SDCL 21-21-1, SDCL 21-21-3, and other applicable law, if any.

## PRAYER FOR RELIEF

**NOW, THEREFORE**, Compeer, prays for judgment against the Defendants as follows:

a.    On Count I, for an Order that Defendants are not entitled to agricultural credit mediation pursuant to S.D.C.L. § 54-13-10;

b.    On Counts II, III, IV, for a judgment against each Defendant in an amount to be determined at trial;

c.    On Count V, for an Order granting Compeer possession of the personal property constituting Compeer's Collateral for the purpose of liquidating said Collateral and applying the liquidation proceeds to collection costs, liquidation expenses, attorney fees and charges, then to the indebtedness due and owing under the Lines of Credit, in the manner provided by the Uniform Commercial Code;

d.    On Count VI, for a judgment against Sunwold and Sunterra in an amount to be determined at trial;

e.    On Count VII, for a judgment against each Defendant in an amount to be determined at trial;

f.    On Count VIII, for an Order to Show Case, for Entry of an Order Granting Appointment of a Receiver providing for the appointment of Creative Planning Business Alliance, LLC, as Receiver of the Defendants pursuant to SDCL 21-21-1, SDCL 21-21-3, and other applicable law, if any, including the appointment of a receiver on an ex parte basis pursuant to SDCL 21-21-6; and

g.    Such other and further relief as the court deems just and proper.

# [Signature Page and Verification Page on the Following Pages]

Dated this 18th day of March, 2025.

*/s/ Jennifer G. Lurken*

Jennifer G. Lurken    #4371
GISLASON & HUNTER LLP
2700 South Broadway
P. O. Box 458
New Ulm, MN  56073-0458
Phone:  507-354-3111
Fax:  507-354-8447
Email:  jlurken@gislason.com

*Attorneys for Plaintiff Compeer Financial, PCA*

28

<u>VERIFICATION</u>

STATE OF MINNESOTA )
                                      ) ss.
COUNTY OF BLUE EARTH )

      Steve Grosland, being first duly sworn, deposes and says that he is the Principal Credit

Officer Risk of Compeer Financial, PCA, that he has reviewed the allegations of the foregoing

Complaint, and that the same are true of his knowledge, except as to matters stated on information

and belief, and as to those matters, he believes them to be true.

      I declare under penalty of perjury that everything I have stated in this document is true and
correct.

      Dated this _18_ day of March, 2025, at Blue Earth County, Minnesota.

                                        Steve Grosland
                                        Compeer Financial
                                        1921 Premier Drive
                                        Mankato, MN  56001