| | | Clerk's Stamp |
|---|---|---|
| COURT FILE NUMBER | | |
| COURT | COURT OF KING'S BENCH OF ALBERTA | |
| JUDICIAL CENTRE | CALGARY | |
| PLAINTIFF | NATIONAL BANK OF CANADA | |

| | |
|---|---|
| DEFENDANTS | SUNTERRA FOOD CORPORATION, TROCHU MEAT PROCESSORS LTD., SUNTERRA QUALITY FOOD MARKETS INC., SUNTERRA FARMS LTD., SUNWOLD FARMS LIMITED, SUNTERRA BEEF LTD.,  LARIAGRA FARMS LTD., SUNTERRA FARM ENTERPRISES LTD., SUNTERRA ENTERPRISES INC., PRECISION LIVESTOCK DIAGNOSTICS LTD., SOLETERRA D'ITALIA LTD., SUNWOLD FARMS, INC., and SUNTERRA FARMS IOWA, INC. |
| DOCUMENT | **BENCH BRIEF OF NATIONAL BANK OF CANADA** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | McCarthy Tétrault LLP<br>Suite 4000, 421 7th Avenue SW<br>Calgary AB  T2P 4K9<br>Attention: Sean Collins, KC / Pantelis Kyriakakis / Nathan Stewart / Samantha Arbor<br>Phone: 403-260-3531 / 3536 / 3534 / 3506<br>Fax:    403-260-3501<br>Email:  scollins@mccarthy.ca / pkyriakakis@mccarthy.ca / nstewart@mccarthy.ca / sarbor@mccarthy.ca |

---

**BENCH BRIEF OF NATIONAL BANK OF CANADA**

**APPLICATION TO BE HEARD BY**
**THE HONOURABLE JUSTICE M.J. LEMA**

**March 20, 2025 at 10:00 a.m.**

---

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.    THE FACTS ......................................................................................................... 2

III.    ISSUES .............................................................................................................. 14

IV.    LAW ................................................................................................................... 14

V.    ARGUMENT ...................................................................................................... 19

VI.    ORDER REQUESTED ...................................................................................... 36

VII.    LIST OF AUTHORITIES .................................................................................. 37

## I.    INTRODUCTION

1.      National Bank of Canada (as successor to Canadian Western Bank) (the "**Lender**") is the victim of a cheque kiting scheme (the "**Kiting Scheme**"), which involved the circulation of billions of dollars between various Canadian and U.S. bank accounts. The Lender brings this application for the appointment of FTI Consulting Canada Inc. as the interim receiver (the "**Interim Receiver**") of the present and after-acquired bank accounts, monies, funds, receivables, cheques, choses in action, and books and records (collectively, the "**Account Property**") of those Defendants which granted Security[1] or Guarantees to the Lender, along with enhanced investigation powers with respect to the entire Sunterra Group, the Impugned Transactions, the CWB Accounts, the Compeer Accounts (each as defined below) and related matters.

2.      The defendants are part of a broader corporate group of which various members operate a cross-border farming and livestock business primarily focused on pork raising, production, processing, and retail operations in Canada and the United States, and collectively hold 28 accounts (the "**CWB Accounts**) with the Lender.

3.      The Lender first discovered an issue with the Sunterra Group's CWB Accounts in February, 2025.  Specifically, as at February 14, 2024, the Sunterra Group's CWB Accounts (as defined and described below) had accumulated unauthorized overdrafts (the "**Unauthorized Overdrafts**") in excess of US$43 million (the "**Overdraft Indebtedness**").  The Lender immediately commenced an investigation and undertook certain Risk Management Processes (as defined below), which reduced the Overdraft Indebtedness to zero.

4.      The Lender soon discovered that certain Defendants appear to have conducted a highly sophisticated Kiting Scheme, involving bank accounts in Canada and the United States, in which Sunterra Farms Ltd. ("**Sunterra Canada**") and Sunwold Farms Limited ("**Sunwold Canada**", and collectively with Sunterra Canada, the "**Impugned Canadian Entities**"), circulated at least $7 billion Canadian dollars through their CWB Accounts by issuing at least 3,493 cheques, in the approximate amount of $3.561 billion, from their CWB Accounts; the vast majority of which were made payable to Sunterra Farms Iowa, Inc. ("**Sunterra Iowa**") and Sunwold Farms, Inc. ("**Sunwold US**", and collectively with Sunterra Iowa, the "**U.S. Impugned Entities**", the Canadian Impugned Entities and the U.S. Impugned Entities are collectively referred to as, the "**Impugned**

---

[1]    Capitalized terms used herein and not otherwise defined have the same meaning as ascribed to such terms in the Pai Affidavit.

**Entities**") and, in exchange, received at least 2,890 cheques, in the approximate amount of $3.549 billion, mainly from the U.S. Impugned Entities' Compeer Accounts (as defined below); in just the last nine (9) months. This equates to an average of approximately 23 cheques being issued and deposited, each business day.

5.      The Lender's investigation of the Kiting Scheme is ongoing. The Lender requires access to information concerning the Compeer Accounts (as defined below), and from any other financial institution that may also be a victim, with which the Impugned Entities hold accounts, the full and frank disclosure of all necessary information by the Sunterra Group, and further investigatory powers, in order to assess the scope of the Kiting Scheme, identify all involved and affected parties, and assess the risk of claims that could arise against it and the Impugned Entities. The Sunterra Group (as defined below), in the immediate aftermath of confessing that it undertook the Kiting Scheme, promised the Lender that it would consent to the Lender and Compeer being able to discuss and provide documents. They have since backtracked on that promise.

6.      The proposed appointment of the Interim Receiver over the Account Property, rather than all of the property, assets, and undertakings of the Obligors (as defined below), is narrowly-tailored and limited in scope to ensure that the Defendants' operations will continue while the investigation is ongoing. There is no other viable means of addressing and investigating the Kiting Scheme and related Impugned Transactions, and ensuring that all available funds are used for legitimate purposes, with the degree of urgency required by the circumstances. The Lender will fund the Interim Receiver with the funding request model contemplated by the proposed form of order (the "**Interim Receivership Order**"). The appointment of the Interim Receiver is necessary to ensure the protection and preservation of the Lender's rights and interests and the estates of the applicable Defendants, while the investigation is carried out.

## II.      THE FACTS

### A.      Background

7.      The factual background, including the details of the Sunterra Group's business, management, and operations, is described in the Affidavit of Raymond Pai, sworn on March 14, 2025 (the "**Pai Affidavit**").

8.      The Defendants consist of: (i) Sunterra Canada, Sunwold Canada, Sunterra Food Corporation ("**Sunterra Food**"), Trochu Meat Processors Ltd. ("**Trochu**"), Sunterra Quality Food

Markets Inc. ("**Sunterra Markets**", Sunterra Markets, Trochu, Sunterra Food, Sunwold Canada, and Sunterra Canada, are collectively referred to as, the "**Borrowers**"); (ii) Sunterra Beef Ltd. ("**Sunterra Beef**"), Sunterra Iowa, Sunwold US, Sunterra Enterprises Inc. ("**Sunterra Enterprises**"), Sunterra Farm Enterprises Ltd. ("**Sunterra Farm Enterprises**"), Lariagra Farms Ltd. ("**Lariagra**", the Borrowers, Lariagra, Sunterra Farm Enterprises, Sunterra Enterprises, Sunterra Beef, Sunwold US, and Sunterra Iowa, when referred to in their capacity as guarantors, are collectively referred to as the "**Guarantors**", the Guarantors and the Borrowers are collectively referred to as, the "**Obligors**"), and Precision Livestock Diagnostics Ltd. ("**Precision**") and Soleterra d'Italia Ltd. ("**Soleterra**", Soleterra and Precision are collectively referred to as, the "**Additional Sunterra Entities**", the Additional Sunterra Entities and the Obligors are collectively referred to as, the "**Sunterra Group**").

9.      As of March 11, 2024, the Obligors were indebted to the Lender, in the amount of $17,532,351.57, plus accruing interest, fees, costs, and expenses (collectively, the "**Indebtedness**").

10.     As of March 11, 2025, the Lender holds an unappropriated cash in the accounts of the Borrowers, Sunterra Beef, and the Guarantors, in the amount of $4,739,176.82.

11.     The Lender's Security is described in further detail in the Pai Affidavit. At a high level: (i) the Borrowers and Sunterra Beef have granted security, to the Lender, over all of their present and after-acquired personal property; (ii) Trochu has also granted a mortgage, to and in favour of the Lender, over certain lands; (iii) each of the Guarantors has granted unconditional guarantees, to the Lender, with respect to the indebtedness, liabilities, and obligations of the Borrowers, to the Lender; and, (iv) the Additional Sunterra Entities are not borrowers or guarantors but hold CWB Accounts with the Lender.

12.     The Sunterra Group is a family-owned enterprise. The ultimate principal shareholders of the Sunterra Group are members of the Price Family. The core guiding minds to the entities are Ray Price, Douglas Price, Glen Price, David Price, and Art Price, who are all directors and shareholders of various members of the Sunterra Group.

13.     In February, 2025, the Lender became aware that the Sunterra Group's CWB Accounts had accumulated the Unauthorized Overdrafts, with Overdraft Indebtedness, then in excess of US$43 million.

- 4 -

14.    Immediately upon the discovery of the Overdraft Indebtedness, the Lender contacted the Chief Executive Officer and President of the Sunterra Group, Mr. Ray Price.

15.    On February 14, 2025, in response to an email sent by the Lender, Ray Price advised (the "**February 14 Email**"), that (emphasis added):

> "1.    Because of the benefit of having our Canadian Farming entities (Sunwold Canada and Sunterra Farms Ltd) on a cash tax basis, and the U.S. entities on an accrual basis, we invoice for pigs (creating a deduction in the U.S.) but not pay for them right away (don't have to include it as income in Canada). We then would pay from the U.S. to Canada, but in order to keep the U.S. entities with the appropriate cash, we would move money back down to the U.S. on an "advance" basis. **It obviously grew beyond what it was meant to be as we continued to make sure that both entities had the money they needed. I apologize for what is [*sic*] ended up happening.**
>
> 2.    Our plan for repayment. At this point, I don't have any quick access to money to cover the overdraft. Here are some of the actions that we will consider:
>
>> a.    **[Redacted]**
>>
>> b.    I will work with Compeer to see if they are willing to keep our existing operating line in place. If they allow that, we have about $4.0 million of room that could come here. It might take a week or two before we know if they are comfortable or not.
>>
>> c.    The U.S. pig operations will be generating about $500,000 per week of net cash flow from now through the end of the summer. We have hedges in place that will guarantee that cash flow.
>>
>> d.    We will be limiting the payment of Accounts Payable. We may be able to stretch our total A/P by $5,000,000 for a period of time without negatively affecting our business.
>>
>> e.    Asset sales
>>
>> **[Redacted]**
>
> I will think about other alternatives over the weekend, and put them in an email to you. I don't know if a suggestion is appropriate, but my preference, if possible at all, would be for something like a term loan with payments of $1,000,000 per month plus the settlement for insurance or other one off cash injections going against the principal. I think there is quite a lot of second security available between the pig operations, and the Markets, so I thought I would mention it."

16.    Following receipt of the February 14 Email, the Lender immediately: (a) implemented the Risk Management Processes (as defined and described below); and, (b) undertook a preliminary

examination of the CWB Accounts to identify the sources and uses of any payments giving rise to the Unauthorized Overdraft, which preliminary review, working backwards from February 14, 2025, has, to date, only covered the period of May 1, 2024 to January 31, 2025 (the "**Preliminary Review Period**").

17.     The Lender has discovered that the following concerning transactions had occurred in the preceding nine (9) month period:

    (a)     Sunterra Canada received incoming cheques, mainly from the U.S. Impugned Entities' bank accounts (collectively, the "**Compeer Accounts**") held with Compeer Financial, ACA ("**Compeer**") in the United States, in the aggregate amount of approximately $2.230 billion, and issued outgoing cheques, mainly to the U.S. Impugned Entities' Compeer Accounts, in the aggregate amount of approximately $2.238 billion; and,

    (b)     Sunwold Canada received incoming cheques, mainly from the U.S. Impugned Entities' Compeer Accounts, in the aggregate amount of approximately $1.319 billion, and issued outgoing cheques, mainly to the U.S. Impugned Entities' Compeer Accounts, in the aggregate amount of approximately $1.323 billion,

    (collectively, the "**Impugned Transactions**" and the cheques comprising same are collectively referred to as, the "**Impugned Cheques**").

**B.     The Kiting Scheme**

18.     Cheque kiting is an unauthorized activity that takes advantage of the conditional liquidity provided by banks, to their customers, in connection with cheque deposits. Generally, when depositing cheques, provisional liquidity is provided to the depositing customer, due to the sequencing between the deposit of the cheque, the customer having access to those funds, and the clearing and settlement process of a cheque, through the Automated Clearing and Settlement System ("**ACSS**") or the United States Bulk Exchange ("**USBE**"), as applicable.  The ACSS or USBE provide the Lender with a final settlement, from the third party banks whose account was used to draw the cheque. The Lender, like most banks, "conditionally credits" cheque deposits to recipients' accounts; before final settlement through ACSS or USBE.

19.     The Sunterra Group, like many commercial banking customers, were not subject to holds on cheque funds. Therefore, cheques deposited into the Sunterra Group's accounts were

immediately available for use, in the amount of their face value, by way of conditional credit, before underlying funds were actually settled through ACSS or USBE, as applicable.

20.     The conditional credit is just that, "conditional". Its availability is conditioned on the cheque clearing as a result of available funds. Importantly, this condition is premised on the issuer of the cheque not creating the appearance of the cheque has cleared by using non-existent funds.

21.     The Kiting Scheme exploited the availability of this conditional credit, to the applicable Sunterra Group entities' benefit. Based upon the Lender's preliminary investigations to date, it appears that the applicable Sunterra Group entities continuously issued new and additional cheques, as between various members of the Sunterra Group, in increasing numbers over time, to create existing and outstanding conditional credit, which was then satisfied by new conditional credit (accruing with the issuance of new cheques); on an ongoing basis.

22.     Due to the significant volume of cheques, issued on a daily basis, and the manual steps required to be undertaken in reviewing same, the Lender's internal fraud accounting specialists have, at present, only completed a review of Impugned Transactions and Impugned Cheques for the period between November 14, 2024 to February 14, 2025 (the "**Specific Review Period**").

23.     The Lender's current understanding of the particulars of the Kiting Scheme is set out in detail in the Pai Affidavit. Both the volume and value of the Impugned Transactions vastly exceed, by many multiples: (i) the consolidated monthly gross revenue of all Borrowers, as set out in the Borrowers' financial reporting to the Lender under the Commitment Letter (the "**Reporting Statements**"); (ii) both the value and volume of cheques issued and deposited by the Canadian Impugned Entities and the U.S. Impugned Entities, which the Lender currently believes were not part of the Kiting Scheme, as compared to the value and volume of cheques which appear to form part of the Kiting Scheme; (iii) the value of all payments made (whether by cheque or otherwise), of all Borrowers, on a consolidated monthly basis; and, (iv) the total receivables (associated or otherwise), of all Borrowers, as reported in the Reporting Statements.

24.     Furthermore, the total annual revenue of all Borrowers, on a consolidated basis, was approximately $143.968 million, for the fiscal year ending December 31, 2024, as reported in the Reporting Statements. Comparatively, approximately $3.138 billion deposited by the Canadian Impugned Entities, for just the period of May 1, 2024 to December 31, 2024.

25.    The total amount of cash circulated by the Impugned Transactions, as part of the Kiting Scheme, during the nine (9) month Preliminary Review Period, exceeds $7 billion Canadian dollars.

26.    The following describes the basic mechanics of the Kiting Scheme, as currently understood by the Lender:

(a)    **Step 1:** A U.S. Impugned Entity would issue a cheque ("**Cheque #1**"), from one of the U.S. Impugned Entities' Compeer Accounts, for an amount under $1 million, which would then be deposited into one of the Canadian Impugned Entities' CWB Accounts;

(b)    **Step 2:** The Lender would "conditionally credit" the applicable CWB Account, for the face value of Cheque #1, upon deposit. As a result, the face value of Cheque #1 would be available for use by the applicable Canadian Impugned Entity, even though Cheque #1 had not cleared pursuant to the clearing rules;

(c)    **Step 3:** A Canadian Impugned Entity would then, prior to Cheque #1 being returned by Compeer, due to there being insufficient funds, issue one or more new cheques, each under $1 million (collectively, "**Cheque #2**") to one or both of the U.S. Impugned Entities, from the corresponding CWB Account, by utilizing the conditional credit provided by the Lender in connection with Cheque #1;

(d)    **Step 4:** Assuming Cheque #2 was deposited into the Compeer Accounts, Compeer would then "conditionally credit" the applicable U.S. Impugned Entity's Compeer Account, for the face value of Cheque #2.  As a result, the face value of Cheque #2 would be available for use by the applicable accountholder, to cover the U.S. Impugned Entities' liquidity needs and the obligations arising in connection with Cheque #1;

(e)    **Step 5:** A U.S. Impugned Entity would then proceed to issue one or more new cheques, each under $1 million (collectively, "**Cheque #3**"), to one or both of the Canadian Impugned Entities, from the corresponding U.S. Impugned Entities' Compeer Account, utilizing the conditional credit provided in connection with Cheque #2; and,

(f)     **Step 6:** The Lender would then "conditionally credit" the applicable Canadian Impugned Entity's CWB Account, for the face value of Cheque #3, upon deposit. As a result, the face value of Cheque #3 would be available for use by the applicable accountholder, to cover the Canadian Impugned Entities' liquidity needs and the obligations arising in connection with Cheque #2.

27.     The above cycle repeated itself, thousands of times.  Mr. Art Price, confirmed that in order to ensure that the Canadian Impugned Entities' CWB Accounts and the U.S. Impugned Entities Compeer Accounts had sufficient conditional credit to satisfy their respective obligations, the Impugned Entities maintained an active log of all available conditional credit, under the Impugned Cheques on a rolling three (3) day basis.

28.     Neither the Canadian Impugned Entities nor the U.S. Impugned Entities had the cash to satisfy the face value of the issued Impugned Cheques; absent unauthorized conditional credit.

29.     The Impugned Entities undertook this elaborate scheme, on an almost daily basis, so as to ensure that there was always sufficient conditional credit available to cover the outstanding Impugned Cheque obligations and to create the illusion that fresh funds were being deposited into each account.

30.     There is no legitimate commercial purpose for the completion of the Impugned Transactions, despite the Obligors' explanation that there was a tax-based purpose (as described in the Pai Affidavit), as the volume and frequency of the Impugned Transactions is not consistent with the cash requirements, operations, or value, of the business. The fashion by which the Kiting Scheme took place does not align with the February 14 Email's tax-based explanation, which leaves the impression that funds were transferred only between the vendor and buyer of the Livestock. The actual flow of funds, in the ordinary course of business, involved a complex flow of Livestock and corresponding receivables (the payment of which was delayed up to 2 years) between five entities.[2]

31.     The Impugned Transactions include certain commonalities, as between them, which are strongly indicative of a Kiting Scheme, including that:

---

[2]     A table demonstrating the flow of livestock and receivables is set forth following paragraph 40 of the Pai Affidavit.

(a)     the Lender's preliminary count of issued cheques discloses that, during the nine (9) months Preliminary Review Period, the Canadian Impugned Entities issued over 3,493 cheques from the CWB Accounts, the overwhelming majority in favour of the U.S. Impugned Entities, which averages approximately 12 cheques, on a daily basis, and received a similar number of cheques in return;

(b)     based upon the review of the three (3) month Specific Review Period, the vast majority of the Impugned Cheques issued were in an amount ranging from $800,000 to $999,000, marginally less than the $1,000,000 threshold, at which such Impugned Cheques would undergo additional scrutiny by the US clearing bank;

(c)     the thousands of Impugned Transactions were undertaken by way of physical cheques, rather than by EFT or wire transfer, which would be more typical in cross-border related entity transactions;

(d)     based upon the Lender's review to date, it appears that substantially all the cheques had no memo line or reference to any existing invoice or ledger;

(e)     Mr. Ray Price confirmed to the Lender, that the Canadian Impugned Entities and the U.S. Impugned Entities utilized conditional credit, under the applicable Compeer Accounts and CWB Accounts, to cause the Impugned Cheques to clear, by issuing further and additional Impugned Cheques, on an ongoing basis; and,

(f)     Mr. Art Price, confirmed that in order to ensure that the Canadian Impugned Entities' CWB Accounts and the U.S. Impugned Entities Compeer Accounts had sufficient conditional credit to satisfy their respective obligations, the Impugned Entities maintained an active log of all available conditional credit, under the Impugned Cheques on a rolling three (3) day basis.

## C.    Investigation and Information Requirements

32.    The Lender believes that the Kiting Scheme likely extends beyond the Specific Review Period and the Preliminary Review Period.  The Lender continues to assess the situation but based on the available information is not able to finalized a review of all Impugned Transactions and Impugned Cheques.

33.     Currently, the Lender does not have access to the account statements regarding the Compeer Accounts or any other activities of the Sunterra Group, not involving the CWB Accounts. The Sunterra Group has refused to provide this information, despite previously having agreed to, and ongoing requests made for same by the Lender and the Financial Advisor (as defined below).

34.     It is not possible to complete any definitive review of the Impugned Cheques or the Impugned Transactions without access to information concerning the Compeer Accounts, the full and frank disclosure of all necessary information by the Sunterra Group, and the various further investigatory powers.  As a result, the Lender is not in a position to determine the full scope of the Kiting Scheme or the Impugned Transactions and therefore seeks the appointment of the Interim Receiver over the Account Property with further investigatory powers to accomplish same.

**D.     Risk Management Processes and Permitted Payments**

35.     On and after February 14, 2025, the Lender implemented the Risk Management Processes, as described in the Pai Affidavit.

36.     By implementing the Risk Management Processes, the Lender has been able to mitigate the effect of the Impugned Transactions and the Unauthorized Overdraft has been eliminated. However, it is unknown to what extent any other financial institutions (most notably, Compeer) have been affected.  It is possible, and in the Lender's assessment likely, that the Compeer Accounts were in an overdraft position.  The Lender has been unable to determine whether this is the case, because the Sunterra Group backtracked on promises made in February 2025, to provide the required information (including the account statements for the Compeer Accounts) to the Financial Advisor or the Lender.

**E.     Default and Demands**

37.     As a result of the aforementioned, the Obligors have committed events of default under the Commitment Letter, the Security, and the CWB Account Agreements (each as defined in the Pai Affidavit), including, among others:

        (a)     completing the Impugned Transactions and permitting the Unauthorized Overdrafts to accrue;

        (b)     incurring the Overdraft Indebtedness; and,

(c)     the occurrence of a material adverse change in the financial condition of the Obligors,

(collectively, the "**Default Events**").

38.     As a result of the continuing and unremedied Default Events, the Lender, through its counsel, delivered a Notice of Default and Reservation of Rights Letter, dated March 5, 2025 ("**Notice of Default and Reservation of Rights Letter**"), to the Obligors, which: (i) informed the Obligors that, pursuant to the terms of the Commitment Letter, the Security, and the Guarantees, the Obligors had committed the Default Events; (ii) reserved all of the Lender's rights and remedies, as against the Obligors; and, (iii) requested that the Obligors cooperate with the Lender's investigation, including by, among other things, providing the account statements for the Compeer Accounts and any other information in the possession of the Sunterra Group that will identify, even on a preliminary basis, the deficit which may exist in the Compeer Accounts.

39.     The Sunterra Group indicated through counsel that it does not agree with the assertions made and has reserved all rights.

40.     The Default Events are incapable of being cured.

41.     The Lender, through its counsel, delivered a demand letter, dated March 14, 2025 (the "**Demand Letter**"), to the Obligors, which, among other things, advised the Obligors of the Default Events and demanded that the Obligors immediately repay, to the Lender, all amounts outstanding under and pursuant to the Commitment Letter and the Security.  The Demand Letter also enclosed: (i) six (6) Notices of Intention to Enforce Security (collectively, the "**244 Notices**"), under and pursuant to subsection 244(1) of the *Bankruptcy and Insolvency Act*, RSC 1985, c. B-3 (the "**BIA**"), with respect to each of the Borrowers and Sunterra Beef; and, (ii) Notices of Intention by Secured Creditor (the "**FDMA Notices**"), in accordance with section 21 of the *Farm Debt Mediation Act*, SC 1997, c. 21 (the "**FDMA**"), with respect to each of the Obligors, other than the U.S. Impugned Entities.

42.     The Lender has cancelled any unused portion of the Borrower's demand revolving loan, in accordance with the Commitment Letter. The Borrowers have no margining ability in any event. The current funds available in the CWB Accounts are insufficient to repay the Indebtedness.

**F.      Lack of Cooperation and Loss of Faith in Management**

43.      Following the discovery of the Impugned Transactions and the Unauthorized Overdrafts, the Lender and the Sunterra Group's management engaged in discussions concerning the Impugned Transactions, the Unauthorized Overdraft, and the Default Events.  The purpose of such discussions was to: (i) mitigate against the risk occasioned by the Impugned Transactions, (ii) assess and formalize the Risk Management Processes, (iii) obtain additional information, and (iv) allow the Lender and the Sunterra Group to work to address the Default Events and to take appropriate steps to both deal with the existing Impugned Transactions and prevent further unauthorized Impugned Transactions from occurring.

44.      It initially appeared that the Sunterra Group's management was willing to work collaboratively with the Lender to address the Impugned Transactions and the Unauthorized Overdraft, in an attempt to maintain the delicate balance between funding the Sunterra Group's critical payments, and preserving the Lender's rights; while the Lender continued to investigate the Impugned Transactions and assess the risks resulting from the Impugned Transactions.

45.      As part of such initial collaborative efforts:

(a)      the Obligors executed and delivered a copy of the engagement letter between McCarthy Tétrault LLP, counsel to the Lender, and FTI, dated February 22, 2025, appointing FTI as financial advisor (the "**Financial Advisor**", when acting in such capacity) to provide privileged and confidential advice to McCarthy Tétrault LLP, for the purpose of McCarthy Tétrault LLP advising the Lender in relation to the Impugned Transactions; and,

(b)      a draft forbearance agreement was provided to the Sunterra Group, on February 22, 2025.

46.      At a meeting on February 24, 2025, Messrs. Art Price and Glen price, directors of the Sunterra Group, made various clear and unequivocal statements to the Lender's representatives, including, among others, that: (i) the Impugned Transactions and Unauthorized Overdrafts were caused by Ray Price; (ii) they were unaware of the Impugned Transactions undertaken by Ray Price, and are upset and disappointed with Ray Price for having undertaken the Impugned Transactions; (iii) the Impugned Transactions were a mistake; (iv) Ray Price would be removed as a signatory on all Sunterra Group banking transactions; (v) the Sunterra Group would fully

cooperate with the Financial Advisor, including by providing timely responses for requests for information; (vi) the Sunterra Group would provide written consent to the Lender and Compeer, being the holder of the Compeer Accounts, to facilitate and allow Compeer and the Lender to discuss all aspects of the Impugned Transactions; (viii) the Sunterra Group would provide information to the Lender relating to the Impugned Transactions, including, without limitation, by providing up to date account statements for the Compeer Accounts; and, (ix) the Sunterra Group would immediately review and provide comments, to the Lender, upon receiving the Lender's Revised Draft Forbearance Agreement (as defined below), but many of the high level terms discussed were agreeable.

47.     Based on the discussions and comments received from the Sunterra Group at the Meeting, the Lender subsequently provided a revised draft forbearance agreement to the Sunterra Group, on February 25, 2025 (the "**Revised Draft Forbearance Agreement**").

48.     On March 3, 2025: (i) the Sunterra Group advised the Financial Advisor that it was in possession of spreadsheets from Compeer (the "**Compeer Spreadsheets**") which identified, on a preliminary basis, the deficit in the Compeer Accounts; and, (ii) the Financial Advisor requested copies of Compeer Spreadsheets.

49.     The Sunterra Group has refused to provide the Compeer Spreadsheets or the necessary consents so that the Lender and Compeer can discuss and share information concerning the Impugned Transactions.  The parties have also been unable to come to terms regarding the Revised Draft Forbearance Agreement.

50.     As a result of the Impugned Transactions and the Sunterra Group's subsequent inability or unwillingness to take urgent action and share the necessary information (including the Compeer Accounts), the Lender has lost faith in the Sunterra Group's management.

51.     The Lender believes that there is likely an unauthorized overdraft in the Compeer Accounts, as a result of the Impugned Transactions, including because: (i) the Sunterra Group has refused to provide information which would confirm whether this is the case; (ii) any cheque kiting scheme will typically result in one or more financial institutions suffering a loss, as a result of the fact that conditional credit is utilized to unlawfully obtain funds which do not exist; and, (iii) the Financial Advisor has advised the Lender that, while its analysis is ongoing, its present assessment is that the kiting losses are likely in the Compeer Accounts, but that additional information and co-operation is necessary to complete its investigation.

### III.    ISSUES

52.    The issues are:

(a)    Is the appointment of the Interim Receiver necessary to protect the Lender's interests and the estates of the Obligors? **Answer: Yes.**

(b)    Is it just and convenient to appoint the Interim Receiver? **Answer: Yes.**

(c)    Should the Interim Receiver be granted possession and control of the Account Property? **Answer: Yes.**

(d)    Should the Interim Receiver be granted enhanced investigation powers? **Answer: Yes.**

### IV.    LAW

### A.    Cheque Kiting

#### i.    *Overview of Cheque Kiting*

53.    Cheque kiting is an unauthorized activity, described as follows:

"7    Essentially, the illegal practice of "cheque kiting" begins when a cheque is issued from a bank account whose balance is insufficient to cover it. To create confusion, money is recorded in more than one bank account at one moment in time. In most cases, the money is in transit or quite simply fictitious. The circulation of cheques between various accounts is jointly controlled. […]

8    Thus, cheques and registered funds are circulated from one bank to another and from one account to another, in a manner that maintains fictitious bank balances in some accounts while depositing the very same amounts in other accounts.

9    Obviously, masterminds who undertake this type of fraud take advantage of the clearance periods that are inherent to cheque processing in the banking system.

10    Cheques are circulated so quickly that an account at one banking institution is debited one day and credited the next. Over time, the false increase in bank balances varies from one bank to another, until one of the banks involved realizes that it is part of a kiting scheme and denounces the fraud. The system then collapses and any amounts credited are frozen. […]

11    A picture is worth a thousand words: think of the game of musical chairs, where there are not enough chairs for the number of players when the music stops. […]

12    The time that elapses between the moment a cheque is deposited into a first bank account and the moment that same cheque is recorded in, or deducted from, the bank account from which it is drawn is known as the "float time".

13    The float time permits a depositor-in this case the bankrupt debtors-to withdraw the money deposited before the cheque is cleared by the bank from which the money was drawn. This is how dishonest persons are able to profit from the deception.

14    The simultaneous presence of duplicate amounts in two different bank accounts at the same time creates what is referred to as "float". The float represents the over-evaluation of the balance of a bank account as the result of suspicious transactions at a specific moment in time, if the signs of kiting are identifiable.

*Location Bristar Idealease Inc., Re*, 2012 QCCS 211, at paras. 7-14 [BOA TAB 20].

**B.    Jurisdiction to Appoint the Interim Receiver**

*i.    Section 47 of the BIA*

54.    Section 47 of the BIA states, in pertinent part:

**Appointment of interim receiver**

47 (1) If the **court is satisfied that a notice is about to be sent or was sent under subsection 244(1), it may**, subject to subsection (3), **appoint a trustee as interim receiver of all or any part of the debtor's property that is subject to the security to which the notice relates until the earliest of**

(a)    the taking of possession by a receiver, within the meaning of subsection 243(2), of the debtor's property over which the interim receiver was appointed,

(b)    the taking of possession by a trustee of the debtor's property over which the interim receiver was appointed, and

(c)    the expiry of 30 days after the day on which the interim receiver was appointed or of **any period specified by the court**.

**Directions to interim receiver**

(2) The court may direct an interim receiver appointed under subsection (1) to do any or all of the following:

(a) **take possession of all or part of the debtor's property mentioned in the appointment;**

(b) **exercise such control over that property, and over the debtor's business, as the court considers advisable**;

(c) **take conservatory measures;** and

(d) summarily dispose of property that is perishable or likely to depreciate rapidly in value.

**When appointment may be made**

(3) **An appointment of an interim receiver may be made under subsection (1) only if it is shown to the court to be necessary for the protection of**

(a) **the debtor's estate**; or

(b) **the interests of the creditor who sent the notice under subsection 244(1).**

*BIA*, at s. 47[emphasis added] [BOA TAB 1].

55. The BIA defines "debtor" as follows:

*debtor* includes **an insolvent person and any person who, at the time an act of bankruptcy was committed by him**, resided or carried on business in Canada and, where the context requires, includes a bankrupt;

*BIA*, at s. 2 (definition of "debtor") [emphasis added] [BOA TAB 1].

56. The BIA defines the term "insolvent person" as follows:

*Insolvent person* means a person who is not bankrupt and who resides, carries on business or has property in Canada, whose liabilities to creditors provable as claims under this Act amount to one thousand dollars, and:

(a) who is for any reason unable to meet his obligations as they generally become due,

(b) who has ceased paying his current obligations in the ordinary course of business as they generally become due, or

(c) the aggregate of whose property is not, at a fair valuation, sufficient, or, if disposed of at a fairly conducted sale under legal process, would not be sufficient to enable payment of all his obligations, due and accruing due;

*BIA*, at s. 2 (definition of "insolvent person") [BOA TAB 1].

### ii.   Section 13(2) of the Judicature Act

57.   Section 13(2) of the *Judicature Act* states:

**(2)** An order in the nature of a mandamus or injunction may be granted or a receiver appointed by an interlocutory order of the Court in all cases in which it appears to the Court to be just or convenient that the order should be made, and the order may be made either unconditionally or on any terms and conditions the Court thinks just.

*Judicature Act*, R.S.A. 2000, c. J-2, at s. 13(2) [BOA TAB 5].

### iii.   Section 65 of the Personal Property Security Act

58.   Section 65(7) of the *Personal Property Security Act* ("**PPSA**") states:

65(7) On the application of **any interested person**, the Court may

(a) **appoint a receiver**

*Personal Property Security Act,* R.S.A. 2000, c P-7, at s. 65(7) [emphasis added] [BOA TAB 6].

### iv.   Section 99 of the Business Corporations Act

59.   Section 99 of the Alberta *Business Corporations Act* ("**ABCA**") states:

99   On an application by a receiver or receiver-manager, whether appointed by the Court or under an instrument, or **on an application by any interested person, the Court may make any order it thinks fit including**, without limiting the generality of the foregoing, any or all of the following:

(a) an order appointing, replacing or discharging a receiver or receiver-manager and approving the receiver's or receiver-manager's accounts;

*Business Corporations Act,* R.S.A. 2000, c B-9, at s. 99(a) [emphasis added] [BOA TAB 2].

### v.   Authority for Interim Receiver to Borrow Funds

60.   Section 47.2 of the BIA addresses an interim receiver's borrowings, and states, in pertinent part:

**Orders respecting fees and expenses**

- 18 -

47.2 (1) If an appointment of an interim receiver is made under section 47 or 47.1, **the court may make <u>any order respecting the payment of fees and disbursements of the interim receiver that it considers proper, including</u> an order giving the interim receiver <u>security, ranking ahead of any or all secured creditors, over any or all of the assets of the debtor in respect of the interim receiver's claim for fees or disbursements,</u>** but the court shall not make such an order unless it is satisfied that **all secured creditors who would be materially affected by the order were given reasonable advance notification and an opportunity to make representations to the court.**

**Meaning of disbursements**

(2) In subsection (1), "disbursements" do not include payments made in operating a business of the debtor.

*BIA*, at s. 47.2(1)-(2) **[emphasis added]** [BOA TAB 1].

### *vi.    Farm Debt Mediation Act*

61.    Sections 21 and 22 of the *Farm Debt Mediation Act* ("**FDMA**") state, in pertinent part:

**Notice by secured creditors**

21 (1) Every secured creditor who intends to

(a) enforce any remedy against the property of a farmer, or

(b) commence any proceedings or any action, execution or other proceedings, judicial or extra-judicial, for the recovery of a debt, the realization of any security or the taking of any property of a farmer

shall give the farmer written notice of the creditor's intention to do so, and in the notice shall advise the farmer of the right to make an application under section 5.

**Time of notice**

(2) The notice must be given to the farmer and to an administrator, in the form established by the Minister and in accordance with the regulations, at least 15 business days before the doing of any act described in paragraph (1)(a) or (b).

[…]

**Contravention by creditor**

**22 (1)** Subject to subsection (2), any act done by a creditor in contravention of section 12[3] or 21 is null and void, and a farmer affected by such an act may seek appropriate remedies against the creditor in a court of competent jurisdiction.

*Farm Debt Mediation Act*, S.C. 1997, c. 21 at ss. 21(1), 22(1) [BOA TAB 4].

## V.    ARGUMENT

### i.    *The Interim Receiver Should be Appointed*

**All Threshold Requirements Under the BIA are Satisfied**

62.    This Court has the discretion to appoint an interim receiver, at any time, following the delivery of the 244 Notices, pursuant to Section 47 of the BIA.

63.    The threshold statutory requirement under Section 47 of the BIA, that a notice under Section 244 of the BIA "is about to be sent or was sent" to a debtor, has been met by the delivery of the 244 Notices to the Borrowers and Sunterra Beef.

64.    The Borrowers and Sunterra Beef are "debtors" as contemplated by the BIA. The BIA defines an "insolvent person" as including a corporation who:

(a)    **is not bankrupt** – the Obligors are not bankrupt;

(b)    **carries on business or has property in Canada** – each of the Obligors (i) carries on business in Canada, (ii) is an Alberta corporation, and (iii) among other assets, holds a CWB Account, in Canada;

(c)    **whose liabilities to creditors provable as claims under the BIA amount to one thousand dollars** – each of the Obligors is liable for the Indebtedness, pursuant to the Commitment Letter, the Security, the Borrowers' Cross Guarantee, and the Guarantees. The Lender's claims alone greatly exceed $1,000; and,

(d)    **is for any reason unable to meet their obligations as they generally become due**. In determining whether a party is unable to meet their obligations as they generally come due, particularly in the context of a bankruptcy application, the applicant is typically

---

[3]    Section 12 of the FDMA describes the stay of proceedings which comes into effect when an application made by a "farmer" under the FDMA is granted by the Administrator.

required to prove the existence of more than one unpaid liability. However, a bankruptcy order may be granted where "special circumstances" exist, which includes cases where:

"the debt is significantly large and there is fraud or suspicious circumstances in the way the debtor has handled its assets which required that the processes of the bankruptcy of the Act be set in motion".

*ATB Financial v Coredent Partnership*, **2020 ABQB 587 at paras. 88, 105, citing** *Solid Holdings Ltd, Re*, **2019 BCSC 126 at para. 15 and** *Valente, Re*, **2004 CanLII 8018 (ON CA)**.

In this case, the Obligors are insolvent, and special circumstances exist which justify a relaxation of the typical requirement for proof of multiple unpaid debts, as: (i) the Demand Letters gave demanded the repayment, in full, of the Indebtedness, for which all Obligors are liable; (ii) the Obligors, as a whole, do not have sufficient funds to repay the Indebtedness, nor any other creditors, and have no further access to revolving credit; and, (iii) the Lender, which is owed over $17 million, has provided strong evidence concerning suspicious circumstances in the way that the Sunterra Group, as a whole, has handled its assets. The Sunterra Group is an integrated business operation with shared management and ultimate shareholders, shared secured liabilities, and which engages in numerous intercompany transactions. Accordingly, it is appropriate to extend the application of the "special circumstances" test to all of the Obligors.

## The Appointment of the Interim Receiver is Necessary for the Protection of the Debtor's Estate and the Lender's Interests

65.     Section 47(3) of the BIA provides for two circumstances in which such appointment may be made; specifically, where necessary for the protection of (a) "the debtor's estate"; or (b) "the interests of the creditor who sent the notice under subsection 244(1)".

*BIA*, **s. 47(3) [BOA TAB 1]**.

66.     Both factors are met in this case, as the appointment of the Interim Receiver is necessary for the protection of: (i) the Obligors' estates; (ii) the Lender's interests; and, (iii) the interests of creditors of the Sunterra Group generally, and in particular parties who may have been affected by the Kiting Scheme and the Impugned Transactions.

67.     The requirements for the appointment of the Interim Receiver, under Section 47 of the BIA, are satisfied, as:

(a)     **The appointment is necessary for protection of the Lender's interests and the interests of creditors generally:** The Lender has serious, well-founded concerns in relation to the Impugned Transactions and the Kiting Scheme. Among other things, the Lender faces potential exposure and risk as a result of the Kiting Scheme, for which there was no legitimate commercial purpose. While the Lender has mitigated against the over US$43 million in Overdraft Indebtedness, due to the implementation of the Risk Management Processes, the possibility of further claims exists and the scope of the Kiting Scheme has not yet been determined. Additionally, it is unknown to what extent any other financial institutions (most notably, Compeer) have been affected.  It is possible, and in the Lender's assessment likely, that the Compeer Accounts were in an overdraft position; but the Sunterra Group has refused to provide the information which would prove (or disprove) whether this is the case.

In light of the sheer scale of the Impugned Transactions, and the period of time over which they were undertaken, it is necessary to ensure that a neutral third party with appropriate powers is in place to investigate the Impugned Transactions and prevent further Impugned Transactions from occurring. The Lender faces significant prejudice as a result of the Kiting Scheme. While the management of the Sunterra Group has advised that the Impugned Transactions were caused by Ray Price and that Mr. Price would be removed as an account signatory for the Sunterra Group, (i) Mr. Price is the sole director of Sunterra Beef, Precision, and Soleterra, and a director of each Borrower; and, (ii) the Sunterra Group has ceased cooperating with the Lender. As a result, absent the appointment of the Interim Receiver, the Lender is unable to assess what further steps may be necessary to protect its interests.

The appointment of the Interim Receiver is also to the benefit of the Sunterra Group's creditors, generally, for substantially the same reasons. The scope of affected parties is unknown and the proposed investigation will permit the Interim Receiver to identify other parties, including financial institutions, who are affected by or hold claims arising from the Impugned Transactions and the Kiting Scheme.

(b)  **The appointment is necessary for protection of the Obligors' Estates:** While risk to the assets of the debtor company is a relevant consideration, it is not necessary for the party seeking appointment of an interim receiver to produce evidence of actual or immediate danger of the dissipation of assets if the factors set out in the BIA, concerning protection of the estate or a creditor's interests, are met.  The prejudice to the Obligors is limited as the Interim Receiver's appointment will only be over the Account Property, the Obligors will continue operating, and a funding request model will be put in place.

*CWB Maximum Financial Inc. v 2026998 Alberta Ltd.*, 2020 ABCA 118 at paras. 12-17 [BOA TAB 17], citing *Royal Bank v Canadian Print Music Distributors Inc*, 2006 CanLII 21048, 23 CBR (5th) 42 (ON SC); *Trez Capital Corporation v UC Investments Inc*, 2013 NSSC 381 at para. 57 [BOA TAB 31]; and *Royal Bank v Zutphen Brothers Construction Ltd*, 17 CBR (3d) 314, 1993 CarswellINS 22 (WL Can) (NS SC).

The current situation is untenable, and there is a serious risk of deterioration of the Account Property – and the Lender's collateral as a whole – in the short term. While the Lender's review of the Impugned Transactions is ongoing, there is strong evidence of a Kiting Scheme, which greatly exceeds the "more than a suspicion or speculation" threshold identified in the case law (as discussed below) concerning the risk to assets of a debtor company. The Borrowers have no further access to revolving credit, and it is unclear how the Sunterra Group intends to operate in the absence of further credit. The Lender is prepared to advance funds, to the Interim Receiver, in order to enable the Interim Receiver to carry out its mandate; which, in turn, will permit funding requests to be made for required operational payments. Given that the Kiting Scheme was ongoing, for an indeterminate but potentially significant period of time, there is a risk that there are significant but as yet unknown claims against the Obligors. The appointment of the Interim Receiver, and corresponding investigation powers, are necessary to: (i) ensure that no further Impugned Transactions occur; (ii) ensure the protection and preservation of the Account Property; (iii) enable a neutral third-party to assess, review, and locate information concerning the Impugned Transactions and identify any further or related transactions which may exist; and, (iv) assess any claims against the Obligors resulting from the Impugned Transactions or the Unauthorized Overdrafts, including any claims by Compeer or others;

*Maximum Financial Services Inc. v Corporate Cars Limited Partnership*, 2006 CanLII 40988 (ONSC) at para. 15 [*Maximum v Corporate Cars*] [BOA TAB 21].

    (c)    **The Lender has lost confidence in the debtors' management:** Whether the secured creditors of the debtor company have lost confidence in the management of the debtor company is also a relevant factor in considering whether the appointment is warranted:

> "I accept that there must be more than a suspicion or speculation concerning the assets of a company before an interim receiver is warranted. Where, as here, the major secured creditors who have the most at risk have with legitimate reason lost confidence, I do not think that there has to be an actual immediate risk to assets."

*Maximum v Corporate Cars* at para. 15 [BOA TAB 21].

The Lender has lost confidence in the management of the Sunterra Group, on numerous reasonable grounds, including as a result of: (i) the Sunterra Group's inability or unwillingness to take urgent action to address the Impugned Transactions and share the necessary information, including the Compeer Accounts; and, (ii) the Sunterra Group's decision to cease cooperating with the Lender's investigation of the Impugned Transactions and to backtrack on promises made to the Lender in February 2025.

68.    It is not required that an applicant prove "actual misfeasance and wrongdoing such that assets are being misappropriated or dissipated", and even where there are possible explanations regarding alleged wrongdoing by a debtor company, the applicant will succeed if it can establish "on a balance of probabilities the need for an immediate interim receivership to assure conservation of the Respondents' assets, and hence, protection of the interests of the Bank through its security".

*Royal Bank of Canada v Canadian Print Music Distributors Inc.*, 2006 CanLII 21048 (ON SC), at paras. 16-18 [BOA TAB 26].

69.    Facts demonstrating a *prima facie* case of borrower misconduct or defaults, including material misrepresentations to lenders and/or serious breaches of the loan agreements, have been sufficient to appoint an interim receiver.

*Royal Bank of Canada v Applied Energy Systems Inc.*, 2009 CanLII 69785 (ON SC), at para. 24 [BOA TAB 24].

70.    In the context of the BIA, a requirement to establish a *prima facie* case has been interpreted as requiring that a claim be supported by evidence and not "mere allegations" or "obviously spurious", but the threshold is not particularly high. The Lender has met and exceeded this threshold and there is no credible, commercially reasonable justification for the occurrence of the Impugned Transactions or the Kiting Scheme.

*Smith v PricewaterhouseCoopers Inc.*, 2013 ABCA 288, at para. 19 [BOA TAB 29].

71.    Accordingly, it is respectfully submitted that the appointment of the Interim Receiver over the Account Property of the Borrowers and Sunterra Beef, pursuant to Section 47 of the BIA, is just, convenient, and necessary to ensure the protection of the Lender's interests and the respective estates of the Borrowers and Sunterra Beef.

## It Is Just and Convenient to Appoint the Interim Receiver Under Section 13(2) of the Judicature act

72.    Section 13(2) of the *Judicature Act* provides for the appointment of a receiver, including an interim receiver on an interlocutory basis, where it is "just or convenient" that the appointment be made.

73.    The test for the appointment of an interlocutory receiver is comparable to the test for interlocutory injunctive relief, including: (i) a preliminary assessment of the merits of the case to ensure that there is a serious issue to be tried; (ii) the establishment of irreparable harm to the plaintiff if the application is refused; and, (iii) an assessment of the balance of convenience.

*Anderson v. Hunking*, 2010 ONSC 4008 at para. 15 [BOA TAB 9];
*Murphy v Cahill*, 2012 ABQB 446 at para. 40 [BOA TAB 22].

74.    Where, as is the case with respect to the Borrowers and Sunterra Beef, the creditor seeking court appointment of an interim receiver has the right to appoint a receiver under its security, the nature of the remedy is less extraordinary; the applicant does not need to establish that it will suffer irreparable harm if an interim receiver is not appointed.

*Paragon Capital Corporation Ltd. v Merchants & Traders Assurance Co.*, 2002 ABQB 430 (CanLII) at para. 28 ["*Paragon*"] [BOA TAB 23];
*Bank of Montreal v Carnival National Leasing Limited*, 2011 ONSC 1007 at paras. 24, 29 [BOA TAB 12].

75.     Furthermore, this Court has previously held that the consideration regarding the appointment of an interim receiver under the BIA and the Judicature Act are substantially similar:

> […] The requirements set out in the authorities with respect to interim receiverships, both under the BIA and under the Judicature Act, (that an appointment must be necessary for the protection of an estate of the debtor and that a receiver should not be appointed lightly, but only after careful consideration of the equities) serve as a curb on the inappropriate or overly-broad use of the remedy. It is neither necessary nor advisable to impose a limitation that is not found in the legislation.

*Alberta Health Services v Networc Health Inc.*, **2010 ABQB 373 (CanLII) at para. 19 [BOA TAB 8].**

76.     Accordingly, the same considerations raised above in the context of Section 47 of the BIA apply equally in the context of Section 13(2) of the *Judicature Act*.

77.     In *BCIMC Construction Fund Corporation et al. v The Clover on Yonge Inc.*, the Ontario Superior Court of Justice considered an application for the appointment of an interim receiver under the *Courts of Justice Act*, which permits such appointment "where it appears to a judge of the court to be just or convenient to do so". Justice Koehnen noted that in making such determination, the Court may consider, among other factors, whether: (i) the lender's security is at risk of deteriorating; (ii) there is a need to stabilize and preserve the debtors' business; (iii) loss of confidence in the debtors' management; and (iv) positions and interests of the other creditors.

*BCIMC Construction Fund Corporation et al. v. The Clover on Yonge Inc.*, **2020 ONSC 1953 (CanLII) at paras 44-51 [BOA TAB 14];** *Courts of Justice Act*, **RSO 1990, c C.43 at s. 101(1) [BOA TAB 3].**

78.     The first three factors are addressed in the context of Section 47 of the BIA, above. The final factor, regarding the positions and interests of other creditors, also militates toward the appointment of the Interim Receiver in this case, as: (i) it appears that there is likely an overdraft position in the Compeer Accounts, and Compeer will likely benefit from the completion of an investigation of the Impugned Transactions; (ii) the appointment of the Interim Receiver will permit the Sunterra Group to continue operations, with minimal impact on third-party creditors and stakeholders; (iii) there may be other financial institutions or parties impacted by the Impugned Transactions and who will benefit from identification of the claims against the Sunterra Group arising from the Kiting Scheme and the Impugned Transactions; and, (iv) the funding of the Interim Receiver, by the Lender, by way of the Interim Receiver's Borrowings Charge, will ensure the preservation of the Sunterra Group's property and business while investigations are ongoing.

79.    In considering whether it is just or convenient to appoint a receiver, the Court may also consider, among others, the following factors set forth in *Paragon*:

*Paragon*, at para. 27 [BOA TAB 23].

(a)    **whether irreparable harm might be caused if no order were made, although it is not essential for a creditor to establish irreparable harm if a receiver is not appointed, particularly where the appointment of a receiver is authorized by the security documentation**: In the case of the Borrowers and Sunterra Beef, the applicable GSAs and Mortgage specifically authorize the Lender to seek appointment of a receiver upon default. With respect to all Obligors, there is also a clear risk of irreparable harm to the Lender, such as: (i) the potential erosion of collateral, including as the Sunterra Group has refused to cooperate with the Lender's investigation of the Impugned Transactions and does not have the means, absent the Lender's agreement, to permit critical payments; (ii) the Obligors' inability or failure to cure their Default Events; (iii) the Overdraft Indebtedness having been eliminated only by the Lender's implementation of the Risk Management Processes; and, (iv) the possibility that there may be unknown claims arising from the previous Impugned Transactions;

(b)    **the risk to the security holder taking into consideration the size of the debtor's equity in the assets and the need for protection or safeguarding of the assets while litigation takes place**: The Obligors' equity in the assets is unknown but, for the reasons set forth above, there is a need to protect and safeguard the Account Property while the Impugned Transactions are investigated, and the Obligors are unable to satisfy the Lender's demand for repayment of the Indebtedness;

(c)    **the nature of the property**: The Account Property is limited in scope and can be administered by the Interim Receiver without material interruption to the Obligors' business. Any investigatory, preservatory, and administrative actions can be completed by the Interim Receiver, more simply and cost-effectively than any available alternative means. The Interim Receiver's possession and control of the Account Property will also prevent further Impugned Transactions from occurring and ensure the preservation and accessibility of relevant records;

(d)    **the preservation and protection of the property pending judicial resolution**: As set forth above, the best available means of preserving and protecting the Account Property is through the appointment of the Interim Receiver. There is a history of the Impugned Transactions and the Sunterra Group have ceased cooperating with the Lender. The Lender will not continue to bank the Sunterra Group. Furthermore, the appointment of the Interim Receiver will preserve the Sunterra Group's assets, property, and undertakings more generally, as the proposed Interim Receivership Order contemplates a funding request model and process for the approval of disbursements required to continue the Sunterra Group's operations;

(e)    **the balance of convenience to the parties**: This factor favours the appointment of the Interim Receiver, because: (i) the Obligors are unable to comply with their obligations to the Lender, and have committed multiple Default Events which are incapable of being cured; (ii) the Impugned Entities have taken unilateral, prejudicial actions in breach of their obligations under the Commitment Letter, Security, and Account Agreements, as applicable; and, (iii) the Interim Receiver's appointment will be narrow in scope, mitigating against the potential interruption to the Sunterra Group's business and permitting the Sunterra Group to continue in possession and control of all of their assets, other than the Account Property, which will remain available to fund operations in accordance with the proposed Interim Receivership Order and cash flow forecasts;

(f)    **the enforcement of rights under a security instrument where the security-holder encounters or expects to encounter difficulty with the debtor and others**: The Sunterra Group's refusal to provide the Compeer Spreadsheets and account statements for the Compeer Accounts evidences a clear intention to ignore the Lender's interests;

(g)    **the principle that the appointment of a receiver is extraordinary relief which should be granted cautiously and sparingly**: While appointment of a receiver is extraordinary relief, in the case of the Borrowers and Sunterra Beef, the applicable Security provides the Lender the right to apply for such appointment. The appointment of the Interim Receiver over the other Obligors is a necessary corollary to ensure that the Interim Receiver has access to all information, and

control over all disbursements, which will enable the Interim Receiver to carry out its mandate efficiently and effectively;

(h)     **the consideration of whether a court appointment is necessary to enable the receiver to carry out its' duties more efficiently** and **the goal of facilitating the duties of the receiver**; Appointment of the Interim Receiver, by court order, is necessary to facilitate the Interim Receiver's duties, as the Obligors have refused to cooperate with requests to provide critical information, advised that they disagree with the Lender's assertions, and reserved their rights, suggesting litigation may result. Additionally, the investigation powers contemplated by the Interim Receivership Order are not available to a privately-appointed receiver. There is urgency in commencing the investigation, given the suspicious circumstances and Impugned Transactions, which make the ordinary civil litigation process unsuitable for addressing the Impugned Transactions;

(i)     **the effect of the order upon the parties**: The proposed form of Interim Receivership Order is minimally intrusive and the Interim Receiver's appointment is narrow in scope. This must be balanced against the available alternatives, which are effectively limited to more intrusive and potentially value-eliminating enforcement of the Lender's security interests against each of the Borrowers and Sunterra and litigation against the Guarantors. There is no other available means of completing the necessary investigation of the Impugned Transactions;

(j)     **the conduct of the parties**: The Lender and the Sunterra Group were initially working cooperatively to address the Default Events and facilitate the investigation of the Impugned Transactions. Now, the Sunterra Group refuses to provide information; and,

(k)     **the length of time that a receiver may be in place**: The appointment of the Interim Receiver is proposed for a limited period of time, of up to 120 days. This is intended to ensure that the Interim Receiver has sufficient time to complete its investigations, while providing a reasonable end date to the interim receivership (subject to any further extension of the appointment, if warranted in the circumstances).

80.    It is just and convenient to appoint the Interim Receiver, with enhanced investigatory powers, following the occurrence of the Impugned Transactions and the Unauthorized Overdrafts, including as: (i) the Impugned Transactions and Impugned Cheques arise from an unlawful Kiting Scheme; (ii) it is not currently possible to obtain the remaining information which is necessary to evaluate, assess, and determine the scope of the Kiting Scheme and Impugned Transactions, identify any other wrongdoers, and assess any claims against the Obligors resulting from the Impugned Transactions or the Unauthorized Overdrafts; (iii) the Obligors have ceased cooperating with the Lender; (iv) there is a need to protect and preserve the Account Property; and, (v) the Lender has lost confidence in the management of the Sunterra Group.

### ii.    It Is Appropriate, Just and Convenient to Grant the Interim Receiver Investigation Powers

81.    The Lender also seeks the granting of enhanced investigation powers, to the Receiver, with respect to the Impugned Transactions, the Account Property, and the Sunterra Group.

82.    As Justice Gill recently noted in the 2024 decision, *AutoCanada Capital Motors GP Inc v Mirbach*: (i) the appointment of an interim receiver may be made on "any terms and conditions the Court thinks just", which may include terms in relation to an investigation; and, (ii) there is little case law in Alberta or elsewhere concerning the appointment of an "investigative receiver", or receiver whose purpose is to investigate certain specified matters. However, it is clear that the appropriateness of such an appointment is fact-specific and must be determined in the circumstances at hand:

> "[…] The leading case from Ontario provides several basic principles which are not in dispute to this case. The primary objective of an investigative receiver is to gather information and "ascertain the true state of affairs" concerning the dealings the Receiver was appointed to investigate. *Akagi v Synergy Group (2000) Inc*, 2015 ONCA 368 at para 90, citing *GE Real Estate v Liberty Assisted Living*, 2011 ONSC 4136 at para. The cases do not address the circumstances of a receiver specifically directed by the court to provide factual findings and legal opinions.
>
> [30]    **What is clear from the case law is that a receiver's mandate is to be determined from the specific context, the specific wording of the order and considering all the circumstances of the case**. The Receiver derives its powers solely from the court. […]"

> *AutoCanada Capital Motors GP Inc. v Mirbach*, 2024 ABKB 645 (CanLII), at paras. 27, 29-30 **[emphasis added[ [BOA TAB 11]**, citing *Akagi v Synergy Group (2000) Inc.,* 2015 ONCA 368 at para. 90 [*Akagi*] **[BOA TAB 7]**, citing *GE Real Estate v Liberty Assisted Living*, 2011 ONSC 4136 at para. 103 **[BOA TAB 18]**.

83.    In *Akagi v Synergy Group*, the Ontario Court of Appeal summarized the considerations in determining whether an investigative receiver is warranted, as follows:

> […] Clearly, there are situations where the appointment of a receiver to investigate the affairs of a debtor or to review certain transactions -- including even, in proper circumstances, the affairs of and transactions concerning related non-parties -- will be a proper exercise of the court's "just and convenient" authority under s. 101 of the *Courts of Justice Act*.
>
> […] Some consistent themes emerge from these authorities:
>
> The appointment of the investigative receiver is necessary to alleviate a risk posed to the plaintiff's right to recovery: *Loblaw Brands Ltd. v. Thornton (2009)*, 78 C.P.C. (6th) 189, [2009] O.J. No. 1228 (S.C.J.), at paras. 10, 14 and 16.
>
> The primary objective of investigative receivers is to gather information and "ascertain the true state of affairs" concerning the financial dealings and assets of a debtor, or of a debtor and a related network of individuals or corporations: *General Electric* (Div. Ct.), at para. 15. One authority characterized the investigative receiver as a tool to equalize the "informational imbalance" between debtors and creditors with respect to the debtor's financial dealings: *East Guardian SPC v. Mazur*, *supra*, at para. 75.
>
> Generally, the investigative receiver does not control the debtor's assets or operate its business, leaving the debtor to continue to carry on its business in a manner consistent with the preservation of its business and property: see, e.g., *Loblaw Brands Ltd. v. Thornton (2009)*, 78 C.P.C. (6th) 189, [2009] O.J. No. 1228 (S.C.J.), at para. 17; *Century Services*.
>
> Finally, in all cases the investigative receivership must be carefully tailored to what is required to assist in the recovery of the claimant's judgment while at the same time protecting the defendant's interests, and to go no further than necessary to achieve these ends.

*Akagi*, **at paras. 66, 90 [BOA TAB 7].**

84.    In this case, the Lender has identified a clear rationale for granting the Interim Receiver investigation powers, over the Sunterra Group as a whole, which have been appropriately tailored to the circumstances at hand:

(a)     there is evidence of unauthorized and inappropriate transactions undertaken on behalf of certain members of the Sunterra Group. There are also potentially suspicious transactions involving other members of the Sunterra Group. For instance, the Internal Fraud Group's review of the Impugned Transactions, during the Specific Review Period, also identified a cheque issued, by Sunterra Canada, in the amount of approximately Cdn.$4.364 million, to and in favour of Sunterra

Farms Greenhouse Ltd., with a corresponding cheque received, by Sunterra Canada, in the amount of Cdn. $4.5 million, from Sunterra Farms Greenhouse Ltd.;

(b)     the Financial Advisor has advised the Lender that, while its analysis is ongoing, its present assessment is that the kiting losses are likely in the Compeer Accounts at present, but additional information and co-operation is necessary to complete its investigation;

(c)     in particular, it is not possible to fully investigate the Impugned Transactions, without access to information held by third parties (including the Compeer Spreadsheets and the account statements for the Compeer Accounts), and to obtain access to such information the Sunterra Group's consent must be obtained;

(d)     the Sunterra Group has refused to cooperate and consent to the provision of such information notwithstanding the seriousness of the situation; and,

(e)     while the Impugned Transactions identified to date were between the Impugned Entities, the extension of the investigation to related members of the Sunterra Group is justified as a result of: (i) the fact that the Lender holds security from each of the Borrowers and Sunterra Beef, unlimited guarantees from each of the Obligors, and provides commercial banking services to the Additional Sunterra Entities; (ii) the numerous links between different aspects of the Sunterra Group's business and frequency and complexity of the intercompany and cross-border transfers, which the Interim Receiver will likely need to investigate; (iii) the current lack of information necessary to determine the scope of, and participants or beneficiaries of, the Impugned Transactions; and, (iv) the Sunterra Group, as a whole, obstructing investigation efforts to date. A limited investigation of only the Impugned Entities would be unable to obtain necessary information in the event that the remaining Sunterra Group continue to withhold their consent to disclosure, in the absence of a court order requiring such information to be provided.

85.     The provision of investigation powers, to the Interim Receiver, is therefore necessary in order to: (i) determine the breadth and scope of the Kiting Scheme; (ii) enable a neutral third-party to assess, review, and locate information concerning the Impugned Transactions and identify any further or related transactions which may exist; (iii) identify the parties involved (including any additional members of the Sunterra Group involved in the Impugned Transactions or related

transactions), and the victims of the Kiting Scheme; and, (iv) assess any claims against the Obligors resulting from the Impugned Transactions or the Unauthorized Overdrafts, including any claims by Compeer.

86.    The proposed investigation powers are also the most minimally intrusive means of obtaining the required information. The Interim Receiver is not proposed to take possession of any property, other than the Account Property; nor is the Lender seeking any sort of freezing order or similar relief (such as a Mareva injunction). In the absence of consent from the Sunterra Group, it is necessary to compel the delivery of the information. The Interim Receiver's proposed powers in relation to the preparation of a cash flow forecast, approval of disbursements, taking possession and control of the Account Property, obtaining access to bank accounts and records, and conducting examinations under oath, are consistent with the investigation powers given to interim receivers in other recent cases.

> *Interim Receivership Order, granted on August 23, 2022, by the Honourable Justice Hillier, in Royal Bank of Canada v Faissal Mouhamad Professional Corporation, et al., Court File No. 2203-12557 (ABKB), at paras. 3(h)-(i), (o), and 5 [BOA TAB 25];*
> *Order (Appointing Interim Receiver), granted on April 12, 2024, by the Honourable Justice Steele, in Bank of Montreal v True North Freight Solutions Inc., et al., Court File No. CV-24-00718318-00CL (ONSC (Comm. List)), at paras. 2(a)-(e), (h) [BOA TAB 13].*

### iii.    The Proposed Interim Receiver's Charge Should be Approved

87.    The Interim Receiver's investigation will require funding, as will its administration of the Account Property.

88.    The Lender has agreed to fund the Interim Receiver's borrowings, under a priority charge, on the terms set out in the Pai Affidavit and proposed form of Interim Receivership Order.

89.    Section 47.2 of the BIA provides the jurisdiction to grant an interim receiver a priority charge as security over the assets of a debtor in respect of the interim receiver's claim for fees or disbursements, provided that the affected secured creditors have been given notice (as is the case here).  The Court has a broad jurisdiction to make "any order … that it considers proper."

> *BIA, s. 47.2(1) [BOA TAB 1].*

90.     The Lender respectfully requests that this Court grant the requested Interim Receiver's Borrowing Charge, which is necessary for the administration and preservation of the Account Property and to enable the Interim Receiver to carry out its duties.

### iv.      The FDMA Does Not Preclude the Appointment of the Interim Receiver

91.     The appointment of an interim receiver does not violate the FDMA waiting period provisions. As stated in *Jacob's Hold Inc. v Canadian Imperial Bank of Commerce* ("**Jacob's Hold**"):

> The appointment by the court of a receiver is for the purposes of preserving the estate of the bankrupt for the benefit of the creditors. It is not formally or otherwise a proceeding for the recovery of a debt, the realization of a security or the taking of any property of a farmer.

**Jacob's Hold Inc. v Canadian Imperial Bank of Commerce, 2000 CanLII 22730 (ONSC) at p. 3 [BOA TAB 19].**

92.     The Supreme Court of British Columbia came to a different conclusion in *Canadian Imperial Bank of Commerce v Foxtrot Farms ULC* ("**Foxtrot**"), holding that a secured creditor's interim receivership application could not proceed until the FDMA notice period has expired. While the Court in *Foxtrot* <u>did not</u> state that there are no circumstances in which an interim receivership application could proceed prior to the expiration of an FDMA notice period: however, it did "not find it necessary for the appointment of an interim receiver, which is an extraordinary remedy". Instead, the Court ordered the farmer to disclose certain information concerning a management agreement to the creditor immediately and granted leave to reappear "should further matters arise regarding the proper management of the operation and assets and should further risks be identified".

**Canadian Imperial Bank of Commerce v Foxtrot Farms ULC, 2024 BCSC 1019 at paras. 19, 22, 30 [Foxtrot] [BOA TAB 15].**

93.     *Foxtrot* is distinguishable from the present circumstances, as:

(a)      the creditor in *Foxtrot* sought the appointment of an interim receiver with full possession and control of the debtor's business, unlike the proposed appointment of the Interim Receiver over only the Account Property;

(b)      the creditor in *Foxtrot* specifically intended to seek the appointment of "a full receiver under s. 243 of the BIA and s. 39 of the *Law and Equity Act*" once all

notice periods had elapsed, and the interim receivership was intended as a stepping stone to more fulsome enforcement measures. In this case, the Lender seeks the appointment of the Interim Receiver primarily to facilitate an investigation and ensure no further Impugned Transactions occur. The Borrowers have advised they are actively seeking to repay the Indebtedness and the Lender hopes this will occur;

(c)     while the debtor company in *Foxtrot* was in default under its credit facilities and had failed to make payments, there were no allegations of improper transactions and no apparent urgency to the application, unlike the present circumstances. The Court in *Foxtrot* specifically found that the appointment of an interim receiver appeared not to be necessary in light of the debtor's management of the business and that an offer had been received for the assets; and,

(d)     the Court placed significant emphasis on the purpose of the FDMA, which is "intended to enable farmers to **continue operating** while benefiting from a grace period before entering into arrangements with their creditors" [**emphasis added**]. The appointment of an interim receiver in *Foxtrot* would have prevented the debtor company from managing its business. The appointment of the Interim Receiver over the Account Property is, in contrast, minimally intrusive and will not prevent operations by the Sunterra Group from continuing in the ordinary course, subject to the Interim Receiver's oversight and approval of disbursements.

*Foxtrot*, at paras. 4, 7-9, 16, 18, 21-22 [BOA TAB 15], citing *Corp. Les Produits de la Jardiniere v National Bank of Canada*, [1996] F.C.J. No. 460 at para. 14 [BOA TAB 16].

94.     Justice Côté, in the dissenting reasons in *Saskatchewan (Attorney General) v Lemare Lake Logging Ltd.* ("**Lemare Lake**"), cited *Jacob's Hold* for the proposition that "the [FDMA] stay does not preclude the appointment of an interim receiver under the BIA". The majority reasons did specifically address whether an interim receiver may be appointed notwithstanding the 15 day waiting period under the FDMA, as the issue in *Lemare Lake* related to whether Section 243 of the BIA conflicts with the stay and waiting periods under *The Saskatchewan Farm Security Act*. However, the majority noted that the BIA contemplates that an interim receiver may be appointed over a farmer, and that Sections 47 and 243 of the BIA serve different purposes, with Section 47 aimed at permitting timely, urgent relief:

"Other provisions of the BIA further support a more narrow reading of s. 243's purpose. Notably, s. 47 of the BIA empowers a court to appoint an interim receiver where a notice of intention to enforce a security was sent or is about to be sent under s. 244(1). Where there is an urgent need for the appointment of a receiver, the BIA thus provides a mechanism for the appointment of an interim receiver.

[…] While s. 48 of the BIA provides that ss. 43 to 46 do not apply to individuals whose principal occupation is farming, the provision does not exempt farmers from the operation of s. 47. **This shows that Parliament thinks farmers generally warrant special consideration, but not in cases where an interim receiver under s. 47 is found to be warranted. Promptness and timeliness is a concern that Parliament appears to have addressed precisely through the interim receivership regime.** The potential conflict, if any, between s. 47 of the BIA and Part II of the SFSA is not, however, at issue in this appeal.

[…] Amicus has, with respect, been unable to satisfy his burden to prove that ss. 9 to 22 of the SFSA conflict with the purpose of s. 243 of the BIA . Parliament's purpose of providing bankruptcy courts with the power to appoint a national receiver is not frustrated by the procedural and substantive conditions set out in the provincial legislation. While these conditions require a secured creditor to seek leave before bringing an application for the appointment of a receiver under s. 243 — a process which takes at least 150 days and imposes other procedural and substantive requirements — they **do not hinder the purpose of allowing for the appointment of a national receiver.**"

*Saskatchewan (Attorney General) v Lemare Lake Logging Ltd.*, 2015 SCC 53, at paras. 50, 73 (per Abella and Gascon JJ, for the majority) and 106 (per Côté J, in dissent) **[BOA TAB 28].**

95.    Appointment of the Interim Receiver is the most minimally intrusive available means of addressing the urgent and significant concerns raised by the Lender concerning the Impugned Transactions and the Kiting Scheme, and the proposed scope of the Interim Receiver's powers is consistent with the purposes of both the BIA and the FDMA. It is respectfully submitted that: (i) it is not necessary to resolve any potential conflict between *Jacob's Hold* and *Foxtrot* as the latter is distinguishable in light of the facts and the proposed scope of the Interim Receiver's powers and appointment; and, (ii) *Jacob's Hold* should be followed and the Interim Receiver appointed notwithstanding that the FDMA notice period has not lapsed.

## VI.    ORDER REQUESTED

96.    The Lender respectfully requests that the Application be granted, including: (i) the appointment of the Interim Receiver over the Account Property of the Obligors; and, (ii) the granting of investigation powers to the Interim Receiver.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED THIS 14TH DAY OF MARCH, 2025**

Sean Collins, KC / Pantelis Kyriakakis /
Nathan Stewart / Samantha Arbor
McCarthy Tétrault LLP
Counsel to National Bank of Canada

VII.    **LIST OF AUTHORITIES**

**Statutes**

1.  *Bankruptcy and Insolvency Act*, RSC 1985, c B-3, at sections 2, 47(1)-(3), and 47.2(1)-(2);

2.  *Business Corporations Act*, RSA 2000, c B-9, at section 99(a);

3.  *Courts of Justice Act*, RSO 1990, c C-43, at section 101(1);

4.  *Farm Debt Mediation Act*, SC 1997, c 21, at sections 21(1) and 22(1);

5.  *Judicature Act*, RSA 2000, c J-2, at section 13(2);

6.  *Personal Property Security Act*, RSA 2000, c P-7, at section 65(7);

**Case Law**

7.  *Akagi v Synergy Group (2000) Inc.*, 2015 ONCA 368;

8.  *Alberta Health Services v Networc Health Inc.*, 2010 ABQB 373 (CanLII);

9.  *Anderson v. Hunking*, 2010 ONSC 4008;

10. *ATB Financial v Coredent Partnership*, 2020 ABQB 587;

11. *AutoCanada Capital Motors GP Inc. v Mirbach*, 2024 ABKB 645 (CanLII);

12. *Bank of Montreal v Carnival National Leasing Limited*, 2011 ONSC 1007;

13. *Bank of Montreal v True North Freight Solutions Inc., et al.*, Court File No. CV-24-00718318-00CL (ONSC (Comm. List)), Order (Appointing Interim Receiver), granted on April 12, 2024, by the Honourable Justice Steele;

14. *BCIMC Construction Fund Corporation et al. v. The Clover on Yonge Inc.*, 2020 ONSC 1953 (CanLII);

15. *Canadian Imperial Bank of Commerce v Foxtrot Farms ULC*, 2024 BCSC 1019;

16. *Corp. Les Produits de la Jardiniere v National Bank of Canada*, [1996] F.C.J. No. 460;

17. *CWB Maximum Financial Inc. v 2026998 Alberta Ltd.*, 2020 ABCA 118;

18. *GE Real Estate v Liberty Assisted Living*, 2011 ONSC 4136;

19. *Jacob's Hold Inc. v Canadian Imperial Bank of Commerce*, 2000 CanLII 22730 (ONSC);

20. *Location Bristar Idealease Inc., Re*, 2012 QCCS 211;

21.    *Maximum Financial Services Inc. v Corporate Cars Limited Partnership*, 2006 CanLII 40988 (ONSC);

22.    *Murphy v. Cahill*, 2012 ABQB 446;

23.    *Paragon Capital Corporation Ltd. v Merchants & Traders Assurance Co.*, 2002 ABQB 430 (CanLII);

24.    *Royal Bank of Canada v Applied Energy Systems Inc.*, 2009 CanLII 69785 (ON SC);

25.    *Royal Bank of Canada v Faissal Mouhamad Professional Corporation, et al.*, Court File No. 2203-12557 (ABKB), Interim Receivership Order, granted on August 23, 2022, by the Honourable Justice Hillier;

26.    *Royal Bank of Canada v Canadian Print Music Distributors Inc*, 2006 CanLII 21048, 23 CBR (5th) 42 (ON SC);

27.    *Royal Bank of Canada v Zutphen Brothers Construction Ltd*, 17 CBR (3d) 314, 1993 CarswellNS 22 (WL Can) (NS SC);

28.    *Saskatchewan (Attorney General) v Lemare Lake Logging Ltd.*, 2015 SCC 53;

29.    *Smith v PricewaterhouseCoopers Inc.*, 2013 ABCA 288;

30.    *Solid Holdings Ltd, Re*, 2019 BCSC 126;

31.    *Trez Capital Corporation v UC Investments Inc*, 2013 NSSC 381; and,

32.    *Valente, Re*, 2004 CanLII 8018 (ON CA).