**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| COMPEER FINANCIAL, PCA,<br><br>   PLAINTIFF,<br><br>VS.<br><br>SUNWOLD FARMS, INC., SUNTERRA FARMS IOWA, INC., AND LARIAGRA FARMS SOUTH, INC.,<br><br>   DEFENDANTS. | CASE NO. 25-CV-04044<br><br><br>DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR EX PARTE APPLICATION TO APPOINT A RECEIVER PURSUANT TO SDCL 21-21-6 |

Defendants Sunwold Farms, Inc., Sunterra Farms Iowa, Inc., and Lariagra Farms South, Inc., LLC ("Defendants"), through counsel, responds to Plaintiff's Motion for Ex Parte Application to Appoint a Receiver Pursuant to SDCL 21-21-6, Doc. 2 (the "Motion").

**ARGUMENT[1]**

**I.     Plaintiff's Lawsuit is Premature and Contrary to the Farm Credit Act**

The Farm Credit Act is the result of the financial crisis of the Farm Credit System in the 1980s. *Harper v. Fed. Land Bank of Spokane*, 878 F.2d 1172, 1174 (9th Cir. 1989). As the Congressional Record noted, the act was "'necessary to reassure both American farmers and our financial markets that the Farm Credit System will remain a viable entity next year and into the 21st century.'" *Id*. (quoting 133 Cong.Rec.S. 16831 (Dec. 1, 1987) (remarks of Sen. Leahy)). The Farm Credit Act put provisions in place to protect agricultural borrowers from unfair or unscrupulous tactics by lenders:

> The Farm Credit System was established to ensure the existence of a viable source of credit on reasonable terms for farmers at times when the market will

---

[1] Defendants hereby incorporate the facts and arguments from all hearings and filings herein.

1

> not provide such credit. The Farm Credit System's historical mission has been to strengthen participation in agriculture, by broadening the availability of credit to borrowers ... Unfortunately, during the crises of the past few years the managers of the Farm Credit System seem to have forgotten whom their cooperative was established to serve. In many parts of the country the Farm Credit System looked to foreclosure as a first resort rather than a last resort. ... The bill that we introduce today is aimed at reestablishing Farm Credit System policies that will help farmers in need of help and at preserving local control of the Farm Credit System.

S. 1156, 100th Cong., 1st Sess., 133 Cong.Rec. 6102–03 (May 6, 1987).

As a result, the Farm Credit Act lays out specific procedures that a lender *must* follow before either initiating a foreclosure action or pursuing certain creditor activities. In fact, as the Court of Appeals of Minnesota observed, "[c]ompelling the lender to conform to the provisions of the Farm Credit Act furthers the congressional policy of advancing agricultural development." *Burgmeier v. Farm Credit Bank of St. Paul*, 499 N.W.2d 43, 50 (Minn. Ct. App. 1993) (citations omitted).

One of those protections is the requirement that "each lender establish a policy governing the restructuring of distressed loans." *Id*. (citing 12 U.S.C. § 2202a(g)(1)). Those policies, though, have to comply with the "administrative scheme for review and consideration of applications for restructuring." *Id*. (citing 12 U.S.C. § 2202 (1988)). In fact, "[u]nder section 2202a(b), a state foreclosure proceeding is tolled until a borrower receives notice of the right to file an application for restructuring." *Id*. (citing 12 U.S.C. § 2202a(b)).

Loans considered to be "distressed" are subject to restructuring. *Id*. at 46, fn. 1. A "distressed loan" is defined to be "one that the borrower does not have the financial capacity to pay according to its terms and is delinquent or past due under the terms of the loan contract." *Id*. (citing 12 U.S.C. § 2202a(a)(3) (1988)). "When a qualified lender such as FCB

2

determines that a loan is distressed, the lender must provide written notice to the borrower that the loan may be suitable for restructuring." *Id.* (citing 12 U.S.C. § 2202a(b)(1) (1988)).

Plaintiff sent Defendants a "Notice of Your Right to Apply for Restructuring" on or about February 19, 2025. *See* Affidavit of Anna Limoges in Support of Defendants' Response to Plaintiff's Motion to Avoid Mediation and Defendants' Response to Plaintiff's Motion for Ex Parte Application to Appoint a Receiver, ¶2, Ex. 2 ("Restructuring Notice"). As that notice provides, Defendants "have the right to apply for a restructuring of your loan(s) and [Plaintiff] will review any application you submit." *Id*, p. 3. The notice gave Defendants until April 11, 2025, to provide their response. *Id*.

That April 11, 2025, deadline is not a randomly selected date. It is the result of the statutorily mandated time period afforded to borrowers to figure out a plan to restructure:

> Not later than 45 days before any qualified lender begins foreclosure proceedings with respect to a loan outstanding to any borrower, the lender shall notify the borrower that the loan may be suitable for restructuring and that the lender will review any such suitable loan for restructuring, and shall include with such notice a copy of the policy and the materials described in paragraph (1).

12 U.S.C. § 2202a(b)(2) (1988). Lenders, like Plaintiff, are prohibited from initiating or pursuing a foreclosure action until the expiration of this restructuring window:

> No qualified lender may foreclose or continue any foreclosure proceeding with respect to any distressed loan before the lender has completed any pending consideration of the loan for restructuring under this section.

12 U.S.C. § 2202a(b)(3) (1988). *See also Fed. Land Bank of St. Paul v. Bosch*, 432 N.W.2d 855, 858 (N.D. 1988) ("The Act further provides that no lender may foreclose or continue any foreclosure proceeding with respect to any distressed loan before the lender has completed any pending consideration of the loan for restructuring.").

3

Unfortunately, however, Plaintiff has fallen into the trap prohibited by the Farm Credit Act of pursuing "foreclosure as a first resort rather than a last resort." 133 Cong.Rec. at 6102–03. Plaintiff did not comply with the 45-day restructuring window. Instead, Plaintiff initiated suit against Defendants on March 18, 2025, *weeks* premature from what the statute permits.

As the Court of Appeals of Minnesota observed, "[c]ompelling the lender to conform to the provisions of the Farm Credit Act furthers the congressional policy of advancing agricultural development." *Burgmeier*, 499 N.W.2d at 50 (citing *Federal Land Bank v. Overboe*, 404 N.W.2d 445, 449 (N.D.1987)). In fact, the Court of Appeals of Minnesota even went so far as to void a foreclosure sale based on the lender's failure to afford the borrower the requisite restructuring opportunities. *Id*. ("The failure of FCB to afford restructuring opportunities to appellant before commencing the second foreclosure action provides a defense. The foreclosure sale must be voided.").

What, then, is the appropriate remedy? Per statute, Defendants should be afforded the right to pursue a restructuring of its debt. Plaintiff should also be required to continue to pay those expenses necessary to preserve the ongoing operations of the company. Plaintiff is the only source of funds to pay for the care and maintenance of the collateral. Defendants are unable to pay because Plaintiff has shut down all of Defendants' avenues to pay their vendors.

Everyone agrees that someone has to pay for the care and maintenance of the collateral. That is not disputed. Plaintiff's motion for receiver does not change the fact that the pigs have to be fed, housed, supervised, and provided appropriate veterinary care. In fact, Plaintiff's motion contemplates that it will be responsible for paying these expenses if a receiver is appointed, so that issue is also not disputed. As a result, there is not question that the pigs can be cared for during the window Defendants are afforded to restructure their debt.

4

Plaintiff should be required to continue to pay the expenses associated with Defendants' ordinary course of business until the restructuring period has elapsed.

If, at that time, the Parties are still at an impasse, the Court can then revisit Plaintiff's motion. If, on the other hand, the Court grants Plaintiff's motion, it eliminates Defendants' statutorily-guaranteed rights without proper due process considerations. Not staying this motion until after the restructuring period *encourages* lenders to ignore black letter statutory mandates. Plaintiff's motion should be stayed.

## II. The Appointment of a Receiver is an Extreme Remedy Reserved for Situations Where no Other Means Exist to Preserve the Asset

"The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993) (multiple citations omitted). "Courts do not appoint receivers because of some error in corporate management." *Lewis v. Commonwealth Sec.*, 51 F. Supp. 33, 35 (D. Del. 1943). Instead, "[a] receiver is an extraordinary equitable remedy that is only justified in extreme situations." *Id*. *See also Hollis v. Hill*, 232 F.3d 460, 471–72 (5th Cir. 2000) (citations omitted) ("The appointment of a receiver pendente lite is a harsh and extreme remedy which should be used sparingly and only when the securing of ultimate justice requires it."). "A corollary of this rule is that if the desired outcome may be achieved by some method other than appointing a receiver, then this course should be followed." *Hollis*, F.3d at 472 (citations omitted).

### A. Plaintiff is not Permitted to Manufacture a Crisis to Justify the Appointment of a Receiver

As the Eighth Circuit noted, there are several factors that a court must consider when appointing a receiver:

> a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm.

*Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 981 (8th Cir. 2020) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993)). No factor, in itself, is dispositive. *Id*. at 980. In particular, "absent threatened destruction or dissipation of the property, or where there is no good cause to believe that benefit would result from the appointment of a receiver, then the court should decline to make such an appointment." *Lynch v. Lynch*, 277 S.W.2d 692, 694 (Mo.App.1955) (emphasis omitted).

Plaintiff, here, cannot satisfy this burden. There is no judgment on which Plaintiff is attempting to collect. While some evidence has been submitted, Defendant has not been afforded an adequate opportunity to collect evidence, present a defense, assert affirmative defenses, or do any of the normal things an adverse party would be allowed to do. Instead, Defendants have been afforded less than twenty-four hours to draft two separate briefs and to prepare for an evidentiary hearing, all while trying to negotiate a less restrictive alternative than receivership with Plaintiff.

The only factor that Plaintiff might reasonably satisfy is the danger that property might be lost or diminished in value. That danger, however, is a problem of Plaintiff's own creation. "Generally speaking, a party cannot benefit or gain an advantage from its own misdeeds." *Minichino v. Fox*, 81 Misc. 3d 405, 199 N.Y.S.3d 388 (N.Y. Sup. Ct.), *aff'd*, 219 A.D.3d 1637, 196 N.Y.S.3d 236 (2023), *leave to appeal denied*, 40 N.Y.3d 905, 218 N.E.3d 718 (2023). Here, Plaintiff was responsible for issuing checks to Defendants' vendors for the care and

maintenance of the pigs. The potential interruption of those services is due to Plaintiff's decision to disavow checks that it previously had authorized and approved for payment.

As noted above, the appointment of a receiver will not change who makes payments or how those payments are made. Plaintiff, as Defendants' banker *and* financer, was and will continue to be responsible for making the payments to ensure that the pigs are taken care of. That issue is not disputed by either Plaintiff or Defendant. The only threat to the pigs' health is whether *Plaintiff*, not Defendants, decides to stop paying for those services. If Plaintiff were truly interested in ensuring the health and welfare of the pigs, this brinksmanship over the pigs would not be an issue. Plaintiff should know that care for the pigs comes first, and Plaintiff's desire for a receiver comes second. The fact that Plaintiff has voluntarily allowed the pigs to potentially suffer should demonstrate to the Court where Plaintiff's true concerns lie. Plaintiff's motion for receiver should be denied on that basis alone.

The appointment of a receiver might also have disastrous consequences for Defendants. Many of the contracts that Defendants have entered into have default provision that may be triggered by the appointment of a receiver. A receivership could trigger an avalanche of problems that might trigger even worse consequences for the pigs and for Defendant's ability to repay its debts to Plaintiff. For example, most of the barns where the pigs are housed allow the barns to cancel their contracts if a receiver is appointed In other words, any housing problems the pigs might have now might balloon if a receiver is appointed. The barns could simply reject the pigs on the grounds that the receiver constitutes a default.

Additionally, a receivership could devastate Defendants' other business lines. The pigs subject to Plaintiff's security interest only amount to approximately 110,000 out of

approximately 550,000 pigs that are being cared for by Defendants. The remaining 440,000 pigs are part of contracts that Defendants have with third parties, like Tyson. Those contracts, in turn, have default provisions that may allow Tyson to terminate in the event a receiver is appointed. These contracts include premium provisions that crucial for Defendant to maintain in order to repay its debt to Plaintiff. In other words, appointment of receiver would eliminate one of Defendants' largest sources of revenue and profit—profit that might be used to restructure or repay the debt Plaintiff claims. Appointment of a receive would cut off Defendants' nose to spite its face.

### B.     Less Restrictive Means Exist to Preserve the Collateral

Plaintiff also fails to acknowledge that there are numerous other ways to prevent pigs from dying. Other alternatives, however, do exist that balance both the needs of the pigs with the rights of the parties. As noted above, any payments by the receiver will be financed by Plaintiff. One of those alternatives is the appointment of a lender's agent or manager to oversee Defendants' operation without assuming direct control over Defendants. Appointment of a lender's agent or manager would ensure that money is being spent wisely and to the pigs' benefit without the need for an expensive receiver.

Likewise, the parties have been actively working on a less restrictive alternative than the overly expansive receiver Plaintiff desires. The parties agreed to the appointment of Pipestone, who is already providing veterinary services, to manage certain aspects of Plaintiff's business. This supervision would be primarily focused on the care and maintenance of the 110,000 pigs secured by Plaintiff. Under this scenario, Plaintiff would be responsible for paying for the care of these 110,000 pigs with Pipestone supervising, within limits, what expenses are paid and how revenue is collected. That is something permitted by these third-

party contracts and would prevent interference by Plaintiff in business lines that do not directly impact Plaintiff's security interest.

Ultimately, the parties should be focused on what is important: ensuring the health and safety of the pigs. Plaintiff put those pigs at risk by turning off the financial taps to both its pigs and by taking revenue earmarked by Tyson for the care of its livestock. If Plaintiff had merely followed the procedures contemplated by the Farm Credit Act, we would not be in the emergency we now find ourselves. This Court should encourage the parties to find less restrictive alternatives than a full blown receivership to work through their differences until the restructuring deadline of April 11, which would preserve the collateral and health and safety of the pigs until the restricting plan can be presented. A receivership will do nothing but harm the companies and the pigs. A receivership should be denied.

Dated March 27, 2025.

HALBACH | SZWARC LAW FIRM

By: /s/ Robert D. Trzynka
Alex S. Halbach
Anna M. Limoges
Robert D. Trzynka
108 S. Grange Ave.
Sioux Falls, SD 57104
P: (605) 910-7645
alexh@halbachlawfirm.com
alimoges@halbachlawfirm.com
bobt@halbachlawfirm.com
*Attorneys for Defendants*
