UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| COMPEER FINANCIAL, PCA; | 4:25-CV-04044-ECS |
| Plaintiff, | |
| vs. | |
| SUNWOLD FARMS, INC., SUNTERRA FARMS IOWA, INC.; and LARIAGRA FARMS SOUTH, INC., | OPINION & ORDER GRANTING PLAINTIFF'S MOTION TO AVOID MANDATORY MEDIATION AND MOTION TO APPOINT A RECEIVER |
| Defendants, | |
| THE PORK GROUP, INC.; and TYSON FRESH MEATS, INC.; | |
| Intervenors. | |

On March 18, 2025, Compeer Financial, PCA ("Compeer") filed a verified complaint[1] in South Dakota state court against Sunwold Farms, Inc.; Sunterra Farms Iowa, Inc.; and Lariagra Farms South, Inc. (collectively "Defendants"). Doc. 1-2. On March 24, 2025, the case was removed to this Court. Doc. 1. Compeer's Complaint alleges breach of contract and fraud claims, among others, against Defendants stemming from Defendants' alleged check-kiting scheme[2] and subsequent default on their line of credit with Compeer. Doc. 1-2.

Presently before the Court are Compeer's motions to avoid mandatory mediation and appoint a receiver. Docs. 2, 3. An expedited evidentiary hearing was set for Compeer's motions

---

[1] Steve Grosland, Compeer's representative, signed the pleading in accordance with 28 U.S.C. § 1746. See Doc. 1-2 at 30.
[2] A check-kiting scheme is a systematic depositing of checks without funds into one or more accounts, which causes the bank balance to appear inflated.

1

because it alleges its collateral on Defendants' loans, largely Defendants' 110,000 head of swine, are in danger of diminishing in value given Defendants' insolvent position. Before the hearing, The Pork Group, Inc., and Tyson Fresh Meats, Inc., who both have an interest in Defendants' operations and also seek the appointment of a receiver, intervened. Doc. 12. Because Compeer is threatened with irreparable harm, this Court grants both of its motions.

**I.  Background**

Compeer is a member of the Farm Credit System, providing lending and other financial services to its member-owners, who are producers, processors, and marketers of agricultural products. Doc. 1-2 ¶ 17.[3] Compeer has regularly provided lending services to Defendants over the years. Id. ¶ 18. Defendant Sunterra is a hog management company that manages around 500,000 pig spaces for Sunwold, Lariagra, and various other entities. Id. Defendant Sunwold is a "wean-to-finish" operation that purchases weaned pigs and then raises those pigs to market weight in contract nurseries and finishing barns in South Dakota. Id. ¶ 14. Defendant Lariagra is also a "wean-to-finish" operation that raises pigs to market weight in contract nurseries and finishing barns in South Dakota. Id. ¶ 16. All Defendants have the same parent company, Sunterra Enterprises, Inc., a Canadian corporation allegedly directed by Ray Price, Art Price, and Glen Price. Id. ¶ 8; Doc. 11.

On October 7, 2024, all three Defendants executed and delivered promissory note agreements to Compeer establishing revolving lines of credit. Doc. 1-2 ¶¶ 41, 46, 51. Through these agreements, Sunwold, Sunterra, and Lariagra received $7,000,000, $500,000, and $4,000,000 lines of credit, respectively. Id. Collectively, Defendants had a $11,500,000 line of

---

[3] The background information recited in this section is taken primarily from Compeer's verified Complaint.

credit with Compeer. Id. Defendants' lines of credit were secured by security agreements granting Compeer a senior, perfected security interest in various items of personal property, including but not limited to 110,000 pigs Defendants owned in South Dakota. Id. ¶ 21.

On February 10, 2025, Compeer's Farm Cash Management ("FCM") accounts, which allow Defendants to deposit excess cash to earn interest on those funds, similar to a money market account, showed Defendants had a combined positive balance of approximately $21,000,000 in funds payable to Defendants. Id. ¶¶ 22–23. At this time, Compeer's in-house counsel learned of significant recent activity involving Defendants' accounts. Id. ¶ 24. Defendants were: (i) writing multiple checks each day, which were being sent via next-day mail to be deposited into an account with National Bank of Canada, previously Canadian Western Bank ("CWB"), and (ii) simultaneously sending Compeer multiple checks each day drawn against that CWB account to pay down its lines of credit or increase the balance in its FCM accounts with Compeer. Id. In other words, Defendants were sending nearly identical amounts and numbers of checks back and forth between CWB and Compeer daily. Id. The checks were issued in amounts ranging between $800,000 and $990,000, and no single check exceeded $1,000,000. Id. Compeer alleges these international checks did not exceed $1,000,000 to avoid scrutiny by the United States Bulk Exchange. Id.

Compeer subsequently investigated this matter and believes Defendants were engaged in a sophisticated check-kiting scheme. Id. ¶ 25. Between January 1, 2025, and February 10, 2025, alone, Defendants allegedly issued 474 checks out of their Compeer accounts (for deposit with CWB) for a total of $431,301,200, while during that same time, they deposited 472 checks into their Compeer accounts (out of CWB) for a total of $432,359,712.35. Id. This averages out to approximately 18 checks and $16,588,508 out of the Compeer accounts each day. Id. Compeer

claims Defendants used Compeer's and CWB's financial account "floats" to falsely create the illusion of positive cash balances at Compeer and CWB. Id. ¶ 26.

In response to these revelations, Compeer personnel spoke with Defendants' CEO, Ray Price, on February 11, 2025, to better understand Defendants' check-writing activity. Id. ¶ 27. Following, Compeer's communications with Price, it terminated Defendants' drafting privileges out of Compeer's accounts but stated it would consider permitting checks written for necessary operational expenses. Id. On February 11, 2025, Compeer was notified that 18 drafts had been drawn on the Compeer accounts for intercompany transfers to CWB, totaling $16,302,000. Id. Pursuant to its written notice to Ray Price, Compeer dishonored all 18 drafts. Id. On February 12, 2025, Compeer received another batch of approximately $9,000,000 in checks drawn on the CWB account for deposit into the Defendants' accounts with Compeer. Id. ¶ 29. Compeer personnel then had another video conference with Ray Price. Id. ¶ 30. During the call, Ray Price admitted that Defendants should not have been sending checks back and forth between the same accounts as this was "wrong." Id. Ray Price believed Compeer was holding a $20,000,000 in positive FCM balances that he wanted sent back to the accounts at CWB to cover their overdraft position there. Id. Compeer refused Price's request. Id. ¶ 31.

On February 13, 2025, Compeer personnel had another call with Ray Price. At that time, Price advised that the CWB accounts were overdrawn by approximately $21,000,000 and that they needed money sent back from Compeer to cover the overdrafts. Id. ¶ 32.[4] Compeer advised Price that it would not release any funds until it could verify that there were sufficient funds in

---

[4] On March 17, 2025, CWB filed an application in the Court of King's Bench of Alberta, Canada, requesting the appointment of an interim receiver. Id. ¶ 36.

the account and requested consent to communicate directly with CWB to verify funds. Id. Price refused. Id. ¶¶ 32–33.

During the week of February 24, 2025, Compeer determined that CWB had dishonored 65 checks totaling $59,900,000, which had been credited to Defendants' accounts with Compeer. Id. ¶ 34. As a result, the approximately $21,000,000 positive cash balance that was showing in Defendants' accounts as owed by Compeer to Defendants was immediately wiped out, and instead there was more than $30 million of debt owing from Defendants to Compeer, despite Compeer only providing Defendants with a combined credit limit of $11,500,000. Id.

Given Defendants' financial woes, Compeer claims Defendants Sunwold and Lariagra are not paying barn rent for the barns that are housing some, if not all, of the approximately 110,000 head of swine that Compeer has a security interest in. Id. ¶ 97. Although Compeer has no contractual obligation to continue advancing funds to Defendants, it alleges that it has continued to provide funds to care for and feed the pigs. Id. ¶ 37. Compeer, however, seeks a receiver, in part, because they have trust issues with the parties who they allege perpetrated this fraud against them and CWB. Id. ¶ 38.

As of March 7, 2025, Sunwold owed Compeer approximately $14,001,385. Id. ¶ 64. As of March 7, 2025, Sunterra owed Compeer approximately $18,943,468. Id. ¶ 65. As of March 7, 2025, Lariagra owed Compeer approximately $2,314,842. Id. ¶ 67. Ultimately, Compeer claims that, as of March 7, 2025, Defendants are collectively in debt to Compeer in the approximate amount of $35,259,796. Id. ¶ 68.

Compeer estimates Sunwold's assets are worth $8,955,347. Id. ¶ 45. It estimates Sunterra's assets are worth approximately $3,007,769. Id. ¶ 50. It estimates Lariagra's assets

are worth approximately $7,054,608. Id. ¶ 56. Compeer estimates that the value of all collateral is $19,017,724.

On March 26, 2025, The Pork Group, Inc., ("TPG") and Tyson Fresh Meats, Inc., ("TFM") intervened in this matter. Doc. 12. TPG has a management agreement with Defendant Sunterra in which Sunterra manages hogs owned by TPG for a monthly fee. Doc. 12-1 ¶ 10. Sunterra is responsible for the day-to-day care of the hogs. Id. TFM has a contract with Defendant Sunwold to deliver finished hogs to be processed by TFM at its packing facilities. Id. ¶ 11. TFM pays for these hogs upon delivery pursuant to terms in their contract. Id. TPG and TFM intervened because they were concerned about the continued well-being and care of some additional 300,000 hogs, which are not subject to the security agreements between Compeer and Defendants, in the possession of Defendants. Id. ¶¶ 12–24. Ultimately, TPG and TFM seek a receiver to manage and care for the hogs Defendants' possession. Id.

This Court held an evidentiary hearing on March 27, 2025, where all parties to this matter appeared through counsel. The only witness called at the hearing was Steve Grosland, a risk assessment officer for Compeer. Defendants did not present any witnesses. The evidence at the hearing supports the facts from the pleadings cited above and is hereby incorporated by reference in this Opinion and Order. During the hearing, Compeer, TPG, and TFM all agreed that they would not object to Pipestone Management II, LLC serving as a receiver, if the Court was inclined to grant Compeer's motion.

## II. Discussion

### A. Mandatory Mediation

Compeer first moves to avoid mandatory mediation, Doc. 3. Mandatory mediation is governed by SDCL § 54-13-10, which states:

> A creditor desiring to commence an action or a proceeding in this state to enforce a debt totaling fifty thousand dollars or greater against agricultural land or agricultural property of the borrower or to foreclose a contract to sell agricultural land or agricultural property or to enforce a secured interest in agricultural land or agricultural property or pursue any other action, proceeding or remedy relating to agricultural land or agricultural property of the borrower shall file a request for mandatory mediation with the director of the agricultural mediation program. No creditor may commence any such action or proceeding until the creditor receives a mediation release as described in this chapter, or the debtor waives mediation *or until a court determines after notice and hearing, that the time delay required for mediation would cause the creditor to suffer irreparable harm* because there are reasonable grounds to believe that the borrower may waste, dissipate, or divert agricultural property or that the agricultural property is in imminent danger of deterioration.

(emphasis added). Compeer maintains "the time delay required for the mandatory mediation under SDCL § 54-13-10 would cause Compeer to suffer irreparable harm." Doc 3 at 2. Compeer alleges that "reasonable grounds [exist] to believe that [Defendants will] waste, dissipate, or divert agricultural property or that . . . agricultural property is in imminent danger of deterioration." Doc 8 at 2 (quoting SDCL § 54-13-10). Compeer claims that, because of Defendants' alleged check-kiting scheme, "Defendants are heavily indebted to Compeer, CWB, and likely other financial institutions" and fear their security interest in "approximately 110,000 head of swine located in barns across South Dakota" is in imminent danger. Id. at 2–3. Compeer argues in the alternative that, even if this Court finds there is no irreparable harm, mandatory mediation in this case is impractical because SDCL § 54-13-11 requires that mandatory mediation include "all creditors."[5]

Defendants, on the other hand, maintain that Compeer has not met its burden to avoid mediation. Doc. 16. Mainly, Defendants claim Compeer has not demonstrated the required showing of "irreparable harm." Id. Defendants allege Compeer's harm is self-inflicted because

---

[5] For purposes of this chapter, a "creditor," is "any individual, organization, cooperative, partnership, trust, or state or federally chartered corporation to whom is owed agricultural debt by a borrower." SDCL § 54-13-1(5).

7

it controls the "purse strings," so Defendants cannot pay expenditures without Compeer's permission. Id. Defendants maintain this self-inflicted injury cannot satisfy the "irreparable harm" standard of SDCL § 54-13-10.

"SDCL § 54-13-10 is not jurisdictional in nature and a creditor's failure to file a mediation request does not warrant dismissal." LOL Fin. Co. v. Enger, No. 20-CV-04158, 2021 WL 2477657, at *3 (D.S.D. June 17, 2021) (citing Walsh v. Larsen, 705 N.W.2d 638, 641–43 (S.D. 2005)). Thus, this Court retains jurisdiction to determine whether Compeer is excused from mandatory mediation.

Grosland testified that Defendants' pigs (Compeer's collateral) lack feed and veterinary care. Grosland added that propane was running low, which is used to heat the barns that house Defendants' pigs. Grosland mentioned that pigs must be sheltered in an area with a temperature of 80°F and indicated concern about Defendants' ability to achieve this given the lack of propane. Grosland also had hesitation on whether paychecks for employees that work the pigs, absent this Court's intervention, would be issued.

The Court disagrees with Defendants' argument that Compeer's harm was self-inflicted. At the hearing, Defense counsel argued that Compeer was trying to wrongfully "turn off the taps" on Defendants to cause an emergency. He further stated Compeer could instead protect its interest in the pigs by continuing to funnel money to Defendants. Asking for Compeer to "keep the taps flowing" while Defendants' accounts are overdrawn tens of millions of dollars due to Defendants' alleged fraud is an untenable argument.

After reviewing all the evidence here, the Court determines that "the time delay required for mediation would cause [Compeer and other creditors of Defendants] to suffer irreparable

harm[6] because there are reasonable grounds to believe that [Defendants] may waste, dissipate, or divert agricultural property or that the agricultural property is in imminent danger of deterioration." SDCL § 54-13-10. Thus, this Court grant's Compeer's motion to avoid mandatory mediation, Doc. 3.

### B. Receiver

Compeer asks this Court to appoint a receiver to protect its interest in the 110,000 head of swine that Defendants currently possess. Doc. 2. Compeer first claims that, because Defendants are in default, a receiver needs to be appointed as they all expressly consented to a receiver in the event of a default. Doc. 7 at 4–5. Compeer maintains that a receiver needs to be appointed given the lack of trust they have given Defendants alleged check-kiting scheme and insolvency. Id. at 5–7.

Defendants, on the other hand, contend Compeer's lawsuit is premature since they have not been given 45 days from the notice of their right to restructure their loans under the Agricultural Credit Act. Doc. 18 at 1–2. Given that Compeer sent Defendants a notice of their rights to apply to restructure their loan, Defendants maintain Compeer may not proceed with a foreclosure proceeding until April 11, 2025. Id. at 3. Defendants further contend a receiver is an extreme remedy that is unwarranted at this time. Id. at 5–9.

This Court will first address Defendants' argument that the Agricultural Credit Act prohibits Compeer from proceeding with their request for a receiver. Defendants maintain that because Compeer sent them a notice of restructuring pursuant to 12 U.S.C. § 2202a(b)(2) it is

---

[6] Defense counsel argued that Compeer's injury was not irreparable because it could be fixed with "money." Irreparable harm, however, "may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." Five Star Bank v. Mott, No. 24-CV-6153, 2024 WL 5399075, at *7 (W.D.N.Y. Apr. 4, 2024) (collecting cases).

prohibited from "foreclose[ing] or continu[ing] any foreclosure proceeding with respect to any distressed loan before the lender has completed any pending consideration of the loan for restructuring under this section." 12 U.S.C. § 2202a(b)(3). Defendants argument, however, falters for two reasons.

First, the statute Defendants cite for the authority that Compeer cannot proceed with this action also states:

> This section shall not be construed to prevent any qualified lender from enforcing any contractual provision that allows the lender to foreclose a loan, or from taking such other lawful action as the lender deems appropriate, if the lender has reasonable grounds to believe that the loan collateral will be destroyed, dissipated, consumed, concealed, or permanently removed from the State in which the collateral is located.

12 U.S.C. § 2202a(i). Defendants expressly consented to a receiver in the event of a default. Doc. 1-2 ¶ 59. Additionally, the "reasonable grounds" standard in § 2202a(i) is exceedingly similar to the exception in South Dakota's mandatory mediation statute, SDCL § 54-13-10. This Court made this reasonable grounds determination above and does so in this context as well.

Second, "there is no implied private right of action available to enforce the [Agricultural Credit Act]" because "'Congress intended administrative review to be the exclusive remedy' for violations of the Act." Zajac v. Fed. Land Bank of St. Paul, 909 F.2d 1181, 1183 (8th Cir. 1990) (quoting Harper v. Fed. Land Bank of Spokane, 878 F.2d 1172, 1178 (9th Cir. 1989)). "The prevailing view of the federal courts is that by enacting a comprehensive scheme with the integrated system of procedures for enforcement Congress clearly intended administrative review to be the exclusive remedy available to borrowers for alleged violations of the Agricultural Credit Act. The result is that the state courts are precluded from creating additional legal or equitable remedies." Speck v. Fed. Land Bank of Omaha, 494 N.W.2d 628, 631 (S.D. 1993) (citing Zajac, 909 F.2d 1181 (additional citations omitted)). The South Dakota Supreme Court in

Speck ultimately held that there are "no provisions of South Dakota law that would allow or require importation of the requirements of a federal statute directed at a federal agency into state foreclosure actions." Id. at 632. Thus, because "Congress intended administrative review to be the exclusive remedy," this Court cannot enforce the provisions of the Agricultural Credit Act.

This Court now turns to the parties arguments over the receiver. "The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993). "A receiver is an extraordinary equitable remedy that is only justified in extreme situations." Id. "Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm." Id. at 316–17. "It is well settled that proof of fraud is not required to support a district court's discretionary decision to appoint a receiver." Id. at 317. However, courts often consider the "fraudulent conduct on the part of defendant." See 12 Charles Alan Wright et al., Federal Practice and Procedure § 2983 (3d ed.), Westlaw (database updated June 2024). Additionally, "[t]he existence of a contractual provision consenting to the appointment of a receiver weighs in favor of appointing one." Deutsche Bank Tr. Co. Americas v. Greenfield of Perkiomen Valley, LLC, No. CV 23-1439, 2024 WL 38040, at *2 (E.D. Pa. Jan. 3, 2024).

Although "appointing a receiver is a matter of federal law," courts may also "look to state law for guidance." Morgan Stanley Smith Barney LLC v. Johnson, 952 F.3d 978, 983 (8th Cir.

2020) (cleaned up). Accordingly, this Court will also consider South Dakota receiver law for additional guidance.

> SDCL § 21-21-1 provides:
>
> A receiver may be appointed by the court in which an action is pending, or by the judge thereof, on the application of the plaintiff or of any party whose right to or interest in the property, funds, or proceeds thereof is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured, in any of the following actions: . . . By a creditor to subject any property or fund to his claim.
>
> SDCL § 21-21-3 similarly states:
>
> A receiver may be appointed by the court in which an action is pending, or by the judge thereof, in the cases where a corporation has been dissolved, or is insolvent, or is in imminent danger of insolvency, or has forfeited its corporate rights; or is unable to exercise its corporate functions because of continued dissension between or neglect by its stockholders, directors and officers.

"Receiverships are intended to protect 'property, funds, or proceeds . . . where it is shown that the property or fund is in danger of being lost, removed, or materially injured.'" Case v. Murdock, 528 N.W.2d 386, 388 (S.D. 1995) (quoting SDCL § 21-21-1), aff'd on reh., 544 N.W.2d 205 (S.D. 1996); see also SDCL §§ 21-21-5, 47-26-29. It has been longstanding South Dakota precedent that receivers can be appointed when creditors bring actions against insolvent corporations. See, e.g., State ex rel. Gates v. McGee, 88 N.W. 115, 116 (1901) (citing Comp. Laws, § 5015); Glover v. Manila Gold Min. & Mill. Co., 104 N.W. 261, 265 (1905) (holding that a receiver was necessary when "the allegations of the complaint show that insolvency is imminent" and that "the entire loss of the property of the corporation is likely to result from the illegal acts of the directors"); C.C. Wyman & Co. v. Farmers' Elevator Co., 232 N.W. 259, 262 (1930).

The present situation meets the criteria of an "extreme case." Compeer has presented evidence of a potential fraud and that "there is 'imminent danger that property will be concealed,

12

lost, or diminished in value.'" Crabar/GBF, Inc. v. Wright, No. 16-CV-537, 2023 WL 8110737, at *3 (D. Neb. Nov. 22, 2023) (quoting Morgan Stanley Smith Barney, 952 F.3d at 981). Looking first to the factors annunciated in Aviation Supply, this Court finds that they are all met here. First, Compeer appears to assert valid claims against Defendants. Collectively, Defendants are tens of millions of dollars over their lines of credit. Second, given the alleged check-kiting scheme, the Canadian case brought against Defendants, and the overdrawn balance Defendants have with Compeer, it appears that fraudulent conduct has probably occurred and that conduct has and can continue to impact Compeer's ability to recover their outstanding loans. Third, given Defendants' insolvent position, Compeer's collateral for the loans—mainly the approximate 110,000 swine—are in imminent danger of diminishing in value. Fourth, considering that Defendants' outstanding loan obligations to Compeer exceed their estimated assets, this Court determines that Compeer lacks an adequate legal remedy. For this same reason, the appointment of a receiver appears to be the least drastic equitable remedy especially given the intervenors' interest in some additional 300,000 hogs. In light of the above, this Court also finds the likelihood that appointing the receiver will do more good than harm. Furthermore, Defendants each expressly consented to the appointment of a receiver in the event of a default pursuant to the terms of their security agreement to take possession of all Defendants' collateral. Doc. 1-2 ¶ 59. Thus, this Court grants Compeer's motion to appoint a receiver. Doc. 2.

### III.   Order

For the above reasons, and the record as it now exists before this Court, it is hereby ORDERED that Compeer's motion to avoid mediation, Doc. 3, is granted. It is further ORDERED that Compeer's motion to appoint a receiver, Doc. 2, is granted.[7]

---

[7] The Court will address the receiver and their powers in a separate order.

DATED this 28th day of March, 2025.

BY THE COURT:

_____
ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE